IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| KNIGHT FIRST AMENDMENT INSTITUTE<br>AT COLUMBIA UNIVERSITY, *et al.*,<br><br>    *Plaintiffs*,<br><br>    *v.*<br><br>CENTRAL INTELLIGENCE AGENCY, *et al.*,<br><br>    *Defendants*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 1:18-cv-2709 (TNM) |

## **DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

## **TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND.............................................................. 2

I.      IC Directive 191 ........................................................................................................ 2

II.     The FOIA Requests.................................................................................................... 4

III.    Defendants' Responses to CPJ's FOIA Requests .................................................... 5

        A.   ODNI.................................................................................................................. 5

        B.   NSA.................................................................................................................... 6

        C.   CIA..................................................................................................................... 6

        D.   FBI...................................................................................................................... 7

IV.     Issues Presented by This Motion. ............................................................................. 8

STATUTORY STANDARDS.................................................................................................. 9

I.      The Freedom of Information Act ............................................................................... 9

II.     Special Considerations in National Security Cases ............................................... 10

III.    The *Glomar* Response............................................................................................. 11

ARGUMENT ........................................................................................................................ 11

I.      CIA's Withholding of Documents and Information Responsive to Part 1 is Proper
        under FOIA Exemptions 1, 3, 5, and 6. ................................................................. 11

        A.      CIA Properly Withheld Information under Exemption 1. ................................ 12

        B.      CIA Properly Withheld Information under Exemption 3. ................................ 14

        C.      CIA Properly Withheld Information under Exemption 5. ................................ 17

                1.      CIA Properly Withheld Information Subject to the Attorney-Client
                        Privilege. ............................................................................................... 17

                2.      CIA Properly Withheld Information Subject to the Deliberative
                        Process Privilege.................................................................................... 18

        D.      CIA Properly Withheld Information under Exemption 6 .................................. 20

      E.     CIA Processed and Released All Reasonably Segregable Information ............... 21

II.    Defendants' *Glomar* Responses to Parts 2, 3, and 4 of CPJ's FOIA Request Are Proper under Exemptions 1 and 3 ................................................................................................ 22

      A.     The Existence or Non-Existence of Responsive Records Is a Currently and Properly Classified Fact. ....................................................................................... 23

      B.     Defendants' *Glomar* Responses Are Independently Justified under Exemption 3. ....................................................................................................... 27

            1.     Defendants' Exemption 3 *Glomar* Responses Are Supported by Section 102A(i)(1) of the National Security Act of 1947. ........................ 28

            2.     NSA's Exemption 3 *Glomar* Response is Additionally Supported by the National Security Agency Act of 1959 and 18 U.S.C. § 798. ....... 28

CONCLUSION ........................................................................................................................ 30

# TABLE OF AUTHORITIES

**Cases**

*ACLU v. CIA*,
  710 F.3d 422 (D.C. Cir. 2013) .......................................................................... 11, 27

*ACLU v. DoD*,
  628 F.3d 612 (D.C. Cir. 2011) ............................................................................ *passim*

*Afshar v. Dep't of State*,
  702 F.2d 1125 (D.C. Cir. 1983) ........................................................................... 10

*Agility Pub. Warehousing Co. K.S.C. v. NSA*,
  113 F. Supp. 3d 313 (D.D.C. 2015) ..................................................................... 27

*August v. FBI*,
  328 F.3d 697 (D.C. Cir. 2003) .............................................................................. 9

*Brayton v. Office of U.S. Trade Rep.*,
  641 F.3d 521 (D.C. Cir. 2011) .............................................................................. 9

*Carter v. U.S. Dep't of Commerce*,
  830 F.2d 388 (D.C. Cir. 1987) .............................................................................. 21

*CIA v. Sims*,
  471 U.S. 159 (1985) ................................................................................... 9, 16, 28

*Coastal States Gas Corp. v. U.S. Dep't of Energy*,
  617 F.2d 854 (D.C. Cir. 1980) ......................................................................... 18, 19

*Competitive Enter. Inst. v. NSA*,
  78 F. Supp. 3d 45 (D.D.C. 2015) .......................................................................... 27

*Competitive Enter. Inst. v. U.S. Dep't of Treasury*,
  308 F. Supp. 3d 109 (D.D.C. 2018) ...................................................................... 19

*Ctr. for Nat'l Sec. Studies v. DOJ*,
  331 F.3d 918 (D.C. Cir. 2003) .............................................................................. 10

*DiBacco v. U.S. Dep't of the Army*,
  926 F.3d 827 (D.C. Cir. 2019) .............................................................................. 15

*DoD v. Fed. Labor Relations Auth.*,
  510 U.S. 487 (1994) ............................................................................................. 21

*DOJ v. Reporters Comm. for Freedom of the Press*,
  489 U.S. 749 (1989) ........................................................................................ 20

*Elec. Privacy Info. Ctr. v. NSA*,
  678 F.3d 926 (D.C. Cir. 2012) ....................................................................... 11

*Fed. Trade Comm'n v. Boehringer Ingelheim Pharm., Inc.*,
  892 F.3d 1264 (D.C. Cir. 2018) ..................................................................... 17

*Fitzgibbon v. CIA*,
  911 F.2d 755 (D.C. Cir. 1990) ................................................................ 15, 26

*Formaldehyde Inst. v. HHS*,
  889 F.2d 1118 (D.C. Cir. 1989) ..................................................................... 19

*Gilliam v. DOJ*,
  128 F. Supp. 3d 134 (D.D.C. 2015) ................................................................. 9

*In re Sealed Case*,
  121 F.3d 729 (D.C. Cir. 1997) ....................................................................... 18

*John Doe Agency v. John Doe Corp.*,
  493 U.S. 146 (1989) ..................................................................................... 8, 9

*Juarez v. DOJ*,
  518 F.3d 54 (D.C. Cir. 2008) ......................................................................... 22

*Judicial Watch v. Exp.-Imp. Bank*,
  108 F. Supp. 2d 19 (D.D.C. 2000) ................................................................. 19

*Judicial Watch, Inc. v. DoD*,
  715 F.3d 937 (D.C. Cir. 2013) ................................................................. 12, 23

*Larson v. U.S. Dep't of State*,
  565 F.3d 857 (D.C. Cir. 2009) ......................................................... 9, 10, 29

*Linder v. NSA*,
  94 F.3d 693 (D.C. Cir. 1996) ......................................................................... 29

*Mead Data Ctr., Inc. v. U.S. Dep't of Air Force*,
  566 F.2d 242 (D.C. Cir. 1977) ....................................................................... 17

*Nat'l Sec. Archive Fund, Inc. v. CIA*,
  402 F. Supp. 2d 211 (D.D.C. 2005) ............................................................... 21

iv

*NLRB v. Sears, Roebuck & Co.,*
   421 U.S. 132 (1975) ........................................................................ 16

*Painting & Drywall Work Pres. Fund, Inc. v. HUD,*
   936 F.2d 1300 (D.C. Cir. 1991) ..................................................... 20

*PETA v. Nat'l Inst. of Health,*
   745 F.3d 535 (D.C. Cir. 2014) ................................................. 10, 11

*Reed v. NLRB,*
   927 F.2d 1249 (D.C. Cir. 1991) ..................................................... 21

*Rockwell Int'l Corp. v. DOJ,*
   235 F.3d 598 (D.C. Cir. 2001) ....................................................... 17

*Russell v. Dep't of Air Force,*
   682 F.2d 1045 (D.C. Cir. 1982) ..................................................... 18

*SafeCard Servs., Inc. v. SEC,*
   926 F.2d 1197 (D.C. Cir. 1991) ....................................................... 9

*Stillman v. CIA,*
   319 F.3d 546 (D.C. Cir. 2003) ....................................................... 14

*Sussman v. U.S. Marshals Serv.,*
   494 F.3d 1106 (D.C. Cir. 2007) ..................................................... 22

*Tax Analysts v. IRS,*
   117 F.3d 607 (D.C. Cir. 1997) ....................................................... 17

*U.S. Dep't of Air Force v. Rose,*
   425 U.S. 352 (1976) ........................................................................ 20

*U.S. Dep't of Interior v. Klamath Water Users Protective Ass'n,*
   532 U.S. 1 (2001) ........................................................................... 18

*Wolf v. CIA,*
   473 F.3d 370 (D.C. Cir. 2007) ....................................... 10, 11, 12, 27

**Statutes**

5 U.S.C. § 552(a)(4)(B) ......................................................................... 9

5 U.S.C. § 552(b)(1) ............................................................................ 12

5 U.S.C. § 552(b)(3) ............................................................................ 14

5 U.S.C. § 552(b)(5) ................................................................................................ 16

5 U.S.C. § 552(b)(6) ................................................................................................ 20

5 U.S.C. § 552(b)(9) ................................................................................................ 21

18 U.S.C. § 798 ................................................................................................... 6, 30

50 U.S.C. § 3024(i)(1) ....................................................................................... 16, 28

50 U.S.C. § 3507 ...................................................................................................... 15

50 U.S.C. § 3605 ...................................................................................................... 29

50 U.S.C. § 3605(a) ................................................................................................. 29

**Rules**

Fed. R. Civ. P. 56(a) .................................................................................................. 9

**Executive Materials**

Exec. Order No. 13526, 75 Fed. Reg. 707 (Dec. 29, 2009) .................................. *passim*

## INTRODUCTION

This action arises from a Freedom of Information Act ("FOIA") request submitted by, *inter alia*, remaining Plaintiff Committee to Protect Journalists ("CPJ") to, *inter alia*, remaining Defendants Central Intelligence Agency ("CIA" or "Agency"), Federal Bureau of Investigation ("FBI"), National Security Agency ("NSA"), and the Office of the Director of National Intelligence ("ODNI") (collectively, "remaining Defendants" or "Defendants"). *See* First Amended Complaint ("FAC"), Dkt. No. 17, ¶ 17. In its request, CPJ sought several categories of records related to the late Jamal Khashoggi and Intelligence Community Directive 191, Duty to Warn ("IC Directive 191," "Directive 191," or "ICD-191"), which "establishes … a consistent, coordinated approach" for how the U.S. Intelligence Community ("IC") provides warning to individuals and groups "regarding threats … of intentional killing, serious bodily injury, and kidnapping." FAC ¶¶ 17-18; *see* IC Directive 191, *available at* https://www.dni.gov/files/documents/ICD/ICD_191.pdf (last visited Aug. 27, 2019).

Defendants searched for records responsive to the first part of CPJ's FOIA request, which sought policy documents related to Directive 191, and produced the non-exempt portions of such records. CPJ challenges only CIA's withholdings of certain information responsive to this part of the request, but those withholdings are justified under well-established FOIA exemptions.

With respect the remaining parts of CPJ's request, which, in contrast to Part 1, sought records about the duty to warn under Directive 191 as it applied to Mr. Khashoggi, Defendants asserted so-called "*Glomar*" responses pursuant to FOIA Exemptions 1 and 3, declining to confirm or deny whether responsive records exist. Defendants' *Glomar* responses are appropriate under Exemption 1, because the existence or non-existence of records responsive to Parts 2, 3,

and 4 of CPJ's FOIA request is a currently and properly classified fact—"namely, whether the duty to warn was implicated in connection with Jamal Khashoggi." Declaration of Antoinette Shiner ("Shiner Decl.") ¶ 43. Because the duty to warn procedures set forth by Directive 191 are triggered only when a member of the Intelligence Community "collects or acquires credible and specific information indicating an impending threat of intentional killing, serious bodily injury, or kidnapping directed at a person or group of people," IC Directive 191 § E, acknowledging the existence of responsive records would necessarily acknowledge the existence of antecedent intelligence information about a particular person at a particular time. Conversely, acknowledging that no responsive records exist would tend to reveal a lack of such intelligence information, tending to reveal, for example, either a lack of intelligence interest in particular individuals or collection gaps against certain targets. Either way, such information is quintessentially protected from disclosure by Exemptions 1 and 3.

Accordingly, Defendants are entitled to summary judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.   IC Directive 191

IC Directive 191 is an Intelligence Community Directive, issued by the Director of National Intelligence, and is applicable to the U.S. Intelligence Community.[1] The Directive "establishes in policy a consistent, coordinated approach for how the IC will provide warning regarding threats to specific individuals or groups of intentional killing, serious bodily injury, and kidnapping." The Directive states the policy that "[an] IC element that collects or acquires

---

[1] All remaining Defendants are members of the IC. *See* https://www.dni.gov/index.php/what-we-do/members-of-the-ic (last visited Aug. 27, 2019).

credible and specific information indicating an impending threat of intentional killing, serious

bodily injury, or kidnapping directed at a person or group of people"—an "intended victim," in

the nomenclature of the policy—"shall have a duty to warn the intended victim or those

responsible for protecting the intended victim, as appropriate." ICD-191 § E. It requires, *inter*

*alia*, that each qualifying IC element establish its own internal procedures for effectuating this

policy, *id.* § F. 1, and "designate senior officers responsible for reviewing threat information

initially determined to meet duty to warn requirements to affirm whether the information is

credible and specific, so as to permit a meaningful warning," *id.* § F.2. The IC element's policies

must also "include a provision whereby the duty to warn may be waived," and "include all

justifications [for waiver that are] appropriate for the IC element." *Id.* § F.3 (setting forth

"examples of appropriate justifications" for waiving the duty); *cf. id.* § F.4 (providing that

"[i]ssues concerning whether threat information meets the duty to warn threshold should be

resolved in favor of informing the intended victim," where none of the circumstances justifying

waiver, and listed in § F.3, are present).

Of particular relevance here, IC Directive 191 further specifically provides that "IC

elements shall document and retain records" on specific so-called "duty to warn actions,"

including, *inter alia*, "[t]he method, means, and substance of any warning given by the IC

element," "[s]enior officer reviews of threat information and determinations," and

"[j]ustifications not to warn an intended victim based on waiver criteria …" *Id.* § F.13. Finally,

and also of relevance here, the policy also provides that "[i]f an issue arises among IC elements

regarding a determination to warn an intended victim or waive the duty to warn requirement, or

regarding the method for communicating the threat information to the intended victim,"

resolution shall occur "at the lowest practical and authorized level," but may if necessary be

elevated to the heads of the involved IC elements, and/or the Director of National Intelligence.

*Id.* § G.

## II.   <u>The FOIA Requests</u>

On October 19, 2018, former Plaintiff Knight First Amendment Institute at Columbia

University ("Knight Institute") submitted the following FOIA requests to the CIA, FBI, NSA,

and ODNI, as well as former Defendant Department of State ("DoS"):

> (1)     All procedures or guidance for determining whether to warn, or for delivering a warning to, an intended victim or those responsible for protecting the intended victim, pursuant to Directive 191 [("Part 1")];

> (2)     All records concerning the duty to warn under Directive 191 as it relates to Jamal Khashoggi, including any records relating to duty to warn actions taken with respect to him [("Part 2")];

> (3)     All records concerning any 'issue aris[ing] among IC elements' regarding a determination to warn Jamal Khashoggi or waive the duty to warn requirement, or regarding the method for communicating threat information to him. *See* Directive 191, § G.1 [("Part 3")].

FAC ¶¶ 15, 17; Dkt. No. 17-1 (the Knight Institute's October 19, 2018 requests).

In addition, the Knight Institute also sought—from ODNI only—a fourth category of

records:

> (4)     All records relating to any dispute referred to the [O]DNI regarding a determination to warn Jamal Khashoggi or waive the duty to warn requirement, or regarding the method for communicating threat information to him. *See* Directive 191, § G2 [("Part 4")].

FAC ¶ 18; Dkt. No. 17-1.

On November 20, 2018, remaining Plaintiff CPJ submitted substantively identical

requests to the same agencies. FAC ¶ 16; Dkt. No. 17-2. The Knight Institute has withdrawn its

claims, Dkt. No. 29, and all substantive claims against State have been dismissed, Dkt. No. 30.

Accordingly, only the remaining Defendants' responses to CPJ's requests will be discussed below.

### III.   Defendants' Responses to CPJ's FOIA Requests

#### A.   ODNI

ODNI responded to Plaintiffs' FOIA requests on February 14, 2019. Declaration of Patricia Gaviria ("Gaviria Decl.") ¶ 12 & Ex C thereto. ODNI informed Plaintiffs that it had conducted and completed a search as to Part 1 of the requests, and had located responsive records, all of which had originated with other Defendant agencies. *Id.* Accordingly, ODNI informed Plaintiffs that these records had been referred to the respective other agencies for processing and production. *Id.*[2] Remaining Plaintiff CPJ is not challenging ODNI's response to Part 1 of its request. *See* Defendants' Exhibit ("DEX") 1 (July 12, 2019 email from Plaintiff's counsel).

In the same letter, ODNI further informed Plaintiffs that pursuant to FOIA Exemptions 1 and 3, it could neither confirm nor deny the existence of records responsive to Parts 2, 3, or 4 of the requests. Gaviria Decl. ¶ 12 & Ex C thereto. Specifically, ODNI explained that the fact of the existence *vel non* of such records "is itself currently and properly classified, and could reveal intelligence sources and methods information that is protected from disclosure pursuant to Section 102A(i)(1) of the National Security Act of 1947[.]" *Id.*

---

[2] As the Gaviria Declaration additionally clarifies, there were two such documents, one of which originated with the CIA and the other of which originated with NSA. Gaviria Decl. ¶ 11. CIA and NSA processed these respective documents and provided final responses regarding the same to Plaintiffs. *See* Shiner Decl. ¶ 12; Kiyosaki Decl. ¶ 13 n. 4.

**B.**    **NSA**

NSA responded to Plaintiffs' FOIA requests on March 11, 2019. Declaration of Linda M.
Kiyosaki ("Kiyosaki Decl.") ¶ 13 & Ex. B thereto. NSA informed Plaintiffs that it had conducted
and completed a search as to Part 1 of the requests, and had located two responsive records,
totaling 21 pages, which it simultaneously produced, in part, to Plaintiffs. *Id.* Remaining Plaintiff
CPJ is not challenging NSA's redactions to these records, all of which were made pursuant to
FOIA Exemptions 1 and/or 3. *Id.*; *see also* DEX 1.

In the same letter, NSA further informed Plaintiffs that pursuant to FOIA Exemptions 1
and 3, it could neither confirm nor deny the existence of records responsive Parts 2 or 3 of the
requests. Kiyosaki Decl. ¶ 13 & Ex. B thereto. Specifically, NSA explained that the fact of the
existence *vel non* of such records "is a currently and properly classified matter," and that "the
existence or non-existence of the information" is also protected from disclosure pursuant to
Section 102A(i)(1) of the National Security Act of 1947, as well as Section 6 of the National
Security Agency Act of 1959 and 18 U.S.C. § 798. *Id.*

**C.**    **CIA**

The CIA initially responded to Plaintiffs' FOIA requests on March 15, 2019. Declaration
of Antoinette B. Shiner ("Shiner Decl.") ¶ 13 & fn. 3 & Ex. C thereto. CIA informed Plaintiffs
that it had conducted and completed a search as to Part 1 of the request, and had located
responsive records. *Id.* With respect to Part 1, CIA simultaneously produced in part three
records, totaling 19 pages, and withheld in full two additional records. *Id.* CIA's redactions to the
documents produced in part were pursuant to FOIA Exemptions 1 and 3, and its withholdings of

the documents in full were pursuant to FOIA Exemptions 1, 3, 5, and 6. *Id.*; *see id.* Ex. A (*Vaughn* index).[3]

In the same letter, CIA further informed Plaintiffs that pursuant to FOIA Exemptions 1 and 3, it could neither confirm nor deny the existence of records responsive to Parts 2 or 3 of the requests. Shiner Decl. ¶ 13 & Ex. C thereto. Specifically, CIA explained that the fact of the existence *vel non* of such records "is itself currently and properly classified and relates to CIA intelligence sources and methods information that is protected from disclosure" by, *inter alia*, Section 102A(i)(1) of the National Security Act of 1947. *Id.*[4]

By letter dated March 29, 2019, the CIA provided a supplemental response to Plaintiffs. Shiner Decl. ¶¶ 14-15 & Ex. D thereto. As the CIA explained in this response, in the course of preparing its own response to Plaintiffs' FOIA requests, DoS had located two CIA-originated records that are responsive to Part 1. *Id.* After DoS referred these records to CIA for processing, CIA determined that the records were required to be withheld in full on the basis of FOIA Exemptions 1, 3, 5, and 6. *Id.*; *see also see id.* Ex. A

### D.      **FBI**

FBI responded to Plaintiffs' FOIA requests on March 29, 2019. Declaration of David M. Hardy ("Hardy Decl.") ¶ 18 & Ex. C thereto. FBI informed Plaintiffs that it had conducted and completed a search as to Part 1 of the requests, and had located eight responsive records, totaling 33 pages, which it simultaneously produced, in part, to Plaintiffs. *Id.* Remaining Plaintiff CPJ is

---

[3] The Shiner Declaration inadvertently included two "Exhibit A." The first of these, and the only one referenced in this memorandum, is CIA's *Vaughn* index.

[4] CIA's letter also cited Section 6 of the CIA Act of 1949 in the context of its Exemption 3 *Glomar* response, but the Agency does not rely on that statute to support its response to Parts 2 and 3 here.

not challenging FBI's redactions to these records, all of which were made pursuant to FOIA

Exemptions 1, 3, 6, 7(C), and/or 7(E). *Id.*; *see also* DEX 1.[5]

In the same letter, FBI further informed Plaintiffs that pursuant to FOIA Exemptions 1

and 3, it could neither confirm nor deny the existence of records responsive Parts 2 or 3 of the

requests. Hardy Decl. ¶ 18 & Ex. C thereto. Specifically, citing Section 102A(i)(1) of the

National Security Act of 1947, FBI explained that "the mere acknowledgement of such

records['] existence or nonexistence would in and of itself trigger harm to national security

interests per Exemption (b)(1) and/or reveal intelligence sources and methods per Exemption

(b)(3)[.]" *Id.*

## IV.    Issues Presented by This Motion.

As noted above, the Knight Institute voluntarily dismissed its claims, without prejudice to

its ability to seek fees at a later point in the litigation, Dkt. No. 29; July 19, 2019 Minute Order,

and CPJ dismissed its claims against DoS, also without prejudice to seek attorney's fees and

costs from DoS. Dkt. No. 30; July 30, 2019 Minute Order. CPJ has informed defense counsel

that it was challenging only (1) the *Glomar* responses to Parts 2, 3, and 4 made by FBI, CIA,

ODNI, and the NSA, and (2) CIA's substantive justifications for its withholdings with respect to

Part 1. DEX 1.

---

[5] On May 14, 2019, after determining upon further review that additional information on one
page of its March 29, 2019 production could be segregated for release, FBI produced to Plaintiffs
a revised version of this page, disclosing additional information. Hardy Decl. ¶ 19 & Ex. D
thereto.

## STATUTORY STANDARDS

### I.      The Freedom of Information Act

FOIA reflects a "general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989) (citations omitted). "Congress recognized, however, that public disclosure is not always in the public interest." *CIA v. Sims*, 471 U.S. 159, 166–67 (1985). Accordingly, although FOIA "strongly favors prompt disclosure, its nine enumerated exemptions are designed to protect those 'legitimate governmental and private interests' that might be 'harmed by release of certain types of information.'" *August v. FBI*, 328 F.3d 697, 699 (D.C. Cir. 2003) (quoting *John Doe Agency*, 493 U.S. at 152). Thus, the exemptions must be given "meaningful reach and application" in order to achieve the "workable balance" that Congress has struck "between the right of the public to know and the need of the Government to keep information in confidence." *John Doe Agency*, 493 U.S. at 152 (citations omitted). The agency bears the burden of justifying the withholding of material responsive to a FOIA request, and a court reviews the agency's response to the request *de novo*. 5 U.S.C. § 552(a)(4)(B).

"Most FOIA cases are appropriately resolved on motions for summary judgment." *Gilliam v. DOJ*, 128 F. Supp. 3d 134, 138 (D.D.C. 2015) (citing *Brayton v. Office of U.S. Trade Rep.*, 641 F.3d 521, 527 (D.C. Cir. 2011)). Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A court may award summary judgment in a FOIA action solely on the basis of information provided by the agency through declarations that "describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence

in the record nor by evidence of agency bad faith." *Larson v. U.S. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009) (citation omitted). This is not a high bar: "[u]ltimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Id.*; *see also SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (agencies' FOIA declarations are accorded "a presumption of good faith, which cannot be rebutted by purely speculative claims.").

## II.      Special Considerations in National Security Cases

The issues presented in this case directly "implicat[e] national security, a uniquely executive purview." *Ctr. for Nat'l Sec. Studies v. DOJ*, 331 F.3d 918, 926-27 (D.C. Cir. 2003). Courts "accord substantial weight to an agency's affidavit concerning the details of the classified status of the disputed record[s] [in a FOIA suit] because the Executive departments responsible for national defense and foreign policy matters have unique insights into what adverse [e]ffects might occur as a result of [the disclosure of] a particular classified record." *Larson*, 565 F.3d at 864 (citation omitted); *see also ACLU v. DoD*, 628 F.3d 612, 619 (D.C. Cir. 2011) (hereinafter, "*ACLU v. DoD*") (explaining that "courts lack the expertise to second-guess such agency opinions in the typical national security FOIA case"); *Ctr. for Nat'l Sec. Studies*, 331 F.3d at 927 ("[I]n the FOIA context, we have consistently deferred to executive affidavits predicting harm to the national security, and have found it unwise to undertake searching judicial review."). FOIA "bars the courts from prying loose from the government even the smallest bit of information that is properly classified or would disclose intelligence sources or methods." *Afshar v. Dep't of State*, 702 F.2d 1125, 1130 (D.C. Cir. 1983).

### III.    The *Glomar* Response

"In certain cases, merely acknowledging the existence of responsive records would itself 'cause harm cognizable under [a] FOIA exception.'" *PETA v. Nat'l Inst. of Health*, 745 F.3d 535, 540 (D.C. Cir. 2014) (hereinafter, "*PETA*") (quoting *Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007) (additional citation omitted). "In that event, an agency can issue a *Glomar* response, refusing to confirm or deny its possession of responsive records." *Id.*; *see also* Exec. Order No. 13526, § 3.6(a) 75 Fed. Reg. 707, 719 (Dec. 29, 2009) (expressly providing that "[a]n agency may refuse to confirm or deny the existence or nonexistence of requested records whenever the fact of their existence or nonexistence is itself classified under this order or its predecessors."). To justify a *Glomar* response, "[t]he agency must demonstrate that acknowledging the mere existence of responsive records would disclose exempt information." *Elec. Privacy Info. Ctr. v. NSA*, 678 F.3d 926, 931 (D.C. Cir. 2012) (citing *Wolf*, 473 F.3d at 374). As with more typical FOIA cases, "[c]ourts can grant summary judgment upholding a *Glomar* response based on agency affidavits explaining the basis for the response." *PETA*, 745 F.3d at 540. And again, the agency's burden is not demanding: "'[u]ltimately, an agency's justification for invoking a FOIA exemption,' whether directly or in the form of a *Glomar* response, 'is sufficient if it appears logical or plausible.'" *ACLU v. CIA*, 710 F.3d 422, 427 (D.C. Cir. 2013) (hereinafter, "*ACLU v. CIA*") (quoting *Wolf*, 473 F.3d at 374-75) (additional citations omitted).

### ARGUMENT

### I.    CIA's Withholding of Documents and Information Responsive to Part 1 is Proper under FOIA Exemptions 1, 3, 5, and 6.

As explained above, CIA is the only agency Defendant whose response to Part 1 of the FOIA requests is at issue in this motion. CIA processed a total of seven responsive records,

including one that was located by ODNI in the course of its search and referred to CIA for

processing, and two others that were located by DoS in the course of its search and similarly

referred to CIA for processing. Shiner Decl. ¶¶ 12-14. Of these seven records, CIA produced three

in part (Documents 5, 6, and 7), and withheld four in full (Documents 1, 2, 3, and 4). *Id.* ¶¶ 12-15

& Ex. A attached thereto. CPJ challenges all of these withholdings, but they were all proper.

### A.    CIA Properly Withheld Information under Exemption 1.

Exemption 1 protects from disclosure records that are "(A) specifically authorized … by

an Executive order to be kept secret in the interest of national defense or foreign policy and (B)

are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1). Executive

Order  No. 13526, which currently governs the classification of national security information,

establishes four prerequisites: (1) an original classification authority classifies the information;

(2) the U.S. Government owns, produces, or controls the information; (3) the information is

within one of eight protected categories listed in Section 1.4 of the Order ("Section 1.4"); and (4)

the original classification authority determines that the unauthorized disclosure of the

information reasonably could be expected to result in damage to the national security, and

identifies or describes that damage. Exec. Order No. 13526, § 1.1(a). The information must also

"pertain[] to" one of the categories of information specified in the Executive Order, including

"intelligence activities (including covert action), intelligence sources or methods." Exec. Order

No. 13,526 §§ 1.4(c); *see also Judicial Watch, Inc. v. DoD*, 715 F.3d 937, 941 (D.C. Cir. 2013)

("'[P]ertains' is 'not a very demanding verb.'") (citation omitted). As addressed above, in

matters affecting national security, the courts afford "substantial weight" to an agency's

declarations addressing classified information, and defer to the expertise of agencies involved in

national security and foreign relations. *ACLU v. DoD*, 628 F.3d at 619 (citing *Wolf*, 473 F.3d at 374).

Here, CIA determined that certain information in each of the responsive records is currently and properly classified, and thus exempt from disclosure under Exemption 1. Shiner Decl. ¶¶ 17-23. CIA has provided a declaration from an individual who is authorized to classify national security information, who has personally reviewed the information at issue and confirmed that it is owned and under the control of the United States. *Id.* ¶ 18. Further, the declarant has determined that the information warrants classification to protect "'intelligence activities (including covert action), intelligence sources or methods, or cryptology.'" *Id.* (quoting Exec. Order No. 13526 § 1.4(c)). As the Shiner Declaration explains, the information withheld under Exemption 1 "contains details with respect to the Agency's duty to warn policies and procedures," the disclosure of which "could provide adversaries with valuable insight into CIA operations that could impair the effectiveness of CIA's intelligence collection." *Id.* ¶ 20. Specifically,

> revealing aspects of what types of information or threats the Agency deems sufficient to qualify as "credible and specific," so as to trigger the duty to warn; internal processes related to how the Agency conducts the appropriate analysis of this question; and how warnings are in certain instances conveyed to the intended victim, would disclose details about the practice of intelligence gathering and specific aspects of Agency tradecraft. These details would reveal what type of information the Agency considers in its analysis regarding the duty to warn, which could be utilized by adversaries. For example, adversaries could use the CIA's internal policies and policy related deliberations as a means to detect and/or counteract the Agency's intelligence methods—which could have grave consequences for the security of individuals facing a threat to their life and safety in the context of the duty to warn.

*Id.* ¶ 21.

Separately, the CIA withheld from Document 1 nonpublic information about the locations of covert CIA installations in foreign counties. *Id.* ¶ 22. "The places where CIA maintains a presence constitutes intelligence methods of the Agency.  Official acknowledgement that the CIA has or had a facility in a particular location abroad could cause the government of the country in which the installation is or was located to take countermeasures … to eliminate the CIA's presence within its borders or curtail cooperation with the CIA." *Id.* This, in turn, "could harm the CIA's continued ability to obtain accurate and timely foreign intelligence, and could result in terrorists and foreign intelligence services targeting that installation and the persons associated with it, placing CIA employees and sources at great risk, and harming the Agency's ability to protect personnel." *Id*.

Thus, the information withheld under Exemption 1 "consists of details about foreign liaison and intelligence sources and methods," the disclosure of which "would reveal intelligence sought by the Agency and the means by which it is acquired," and "could reasonably be expected to cause harm, and in some instances serious damage, to the CIA's continued ability to collect this information and to the Agency's relationships with foreign partners." *Id.* ¶ 19. This information is currently and properly classified consistent with the procedural and substantive requirements of Executive Order No. 13526. *Id.* ¶ 23. Based on CIA's declaration, and the deference owed to national security officials in this context, *see Stillman v. CIA*, 319 F.3d 546, 548 (D.C. Cir. 2003), the Court should uphold the Exemption 1 redactions and withholdings by CIA.

### B.   CIA Properly Withheld Information under Exemption 3.

Exemption 3 incorporates into FOIA "the protections of other shield statutes," *ACLU v. DoD*, 628 F.3d at 617-18, by excluding from FOIA's purview matters that are "specifically

exempted from disclosure by statute" if the statute "requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue," or "establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3). The Government's mandate to withhold information under Exemption 3 is broader than its authority under Exemption 1, as it does not have to demonstrate that the disclosure will harm national security. Instead, "[t]o invoke Exemption 3, the government need only show that the withheld material falls within a statute meeting the exemption's conditions." *DiBacco v. U.S. Dep't of the Army*, 926 F.3d 827, 835 (D.C. Cir. 2019) (citation omitted). "If an agency's statements supporting exemption contain reasonable specificity of detail as to demonstrate that the withheld information logically falls within the claimed exemption and evidence in the record does not suggest otherwise … the court should not conduct a more detailed inquiry to test the agency's judgment and expertise or to evaluate whether the court agrees with the agency's opinions." *Id.* Here, CIA invokes Exemption 3 to withhold certain information on two independent bases: the Central Intelligence Act of 1949 ("CIA Act") and the National Security Act of 1947.

1.      *The CIA Act*. It is well-established that the CIA Act, as amended, 50 U.S.C. § 3507 *et seq.*, satisfies the criteria for withholding of information pursuant to Exemption 3. *See Fitzgibbon v. CIA*, 911 F.2d 755, 761 (D.C. Cir. 1990) (recognizing the CIA Act is an Exemption 3 statute and noting that "[t]his conclusion is supported by the plain meaning of the statute, by the legislative history of FOIA, and by every federal court of appeals that has considered the matter"). Here, CIA has invoked the CIA Act to protect from disclosure "information concerning the organization, numbers, names, or official titles of personnel employed by the CIA," Shiner

Decl. ¶ 25—the disclosure of which is expressly prohibited by Section 6 of the CIA Act, 50 U.S.C. § 3507.

      2.    *The National Security Act.* It is equally well-established that the National Security Act also "qualifies as an exemption statute under [E]xemption 3." *ACLU v. DoD*, 628 F. 3d at 619. As amended, Section 102A(i)(1) of this Act provides that the Director of National Intelligence "shall protect intelligence sources and methods from unauthorized disclosure." 50 U.S.C. § 3024(i)(1). The Supreme Court, recognizing the "wide-ranging authority" provided by the National Security Act, has held that it is "the responsibility of Director of Central Intelligence, not that of the judiciary, to weigh the variety of complex and subtle factors in determining whether disclosure of information may lead to an unacceptable risk of compromising the Agency's intelligence-gathering process." *Sims*, 471 U.S. at 180. As the Court observed, the Act "simply and pointedly protect[s] all sources of intelligence that provide, or are engaged to provide, information [that] the Agency needs to perform its statutory duties with respect to foreign intelligence." *Id.* at 169-70.

      Here, CIA has invoked the National Security Act to withhold information that, for the same reasons set forth above regarding CIA's Exemption 1 withholdings, "would reveal intelligence sources and methods and their application by Agency personnel." Shiner Decl. ¶ 26. *See also id*. ("To the extent that the information covered by the [Act] is not classified, it nevertheless would reveal protected intelligence sources and methods related to the Agency's duty to warn policy."). Such information is expressly protected by Section 102A(i)(1) of this Act, and is correspondingly exempt from disclosure under Exemption 3.

### C.      CIA Properly Withheld Information under Exemption 5.

Exemption 5 protects from disclosure "inter-agency or intra-agency memorandums or letters that would not be available by law to a party . . . in litigation with the agency." 5 U.S.C. § 552(b)(5). The exemption ensures that members of the public cannot obtain through FOIA records that would be "normally privileged in the civil discovery context." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975). Among the privileges protected by Exemption 5 are (1) the attorney-client privilege, and (2) the deliberative process privilege. *Rockwell Int'l Corp. v. DOJ*, 235 F.3d 598, 601 (D.C. Cir. 2001).

#### 1.      CIA Properly Withheld Information Subject to the Attorney-Client Privilege.

The attorney-client privilege protects "a confidential communication between attorney and client if the communication was made for the purpose of obtaining or providing legal advice." *Fed. Trade Comm'n v. Boehringer Ingelheim Pharm., Inc.*, 892 F.3d 1264, 1267 (D.C. Cir. 2018). "In the governmental context, the 'client' may be the agency and the attorney may be an agency lawyer." *Tax Analysts v. IRS*, 117 F.3d 607, 618 (D.C. Cir. 1997). "The privilege covers both (i) those communications in which an attorney gives legal advice; and (ii) those communications in which the client informs the attorney of facts that the attorney needs to understand the problem and provide legal advice." *Boehringer Ingelheim Pharm., Inc.*, 892 F.3d at 1267. To invoke the attorney-client privilege, a party must demonstrate that the document it seeks to withhold: (1) involves "confidential communications between an attorney and his client"; and (2) relates to "a legal matter for which the client has sought professional advice." *Mead Data Ctr., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 252 (D.C. Cir. 1977).

17

Here, CIA invokes the attorney-client privilege to protect from disclosure Document 4, "an outline drafted by an attorney for the purpose of briefing Agency clients on legal considerations related to the duty to warn." Shiner Decl. ¶ 29. The document "contains legal advice from an Agency attorney solicited by internal CIA clients on this topic and the confidentiality of these communications has been maintained." *Id.* "If this confidential information—and other confidential information of this nature—were to be disclosed, it would inhibit open communication between CIA personnel and their attorneys, thereby depriving the Agency of full and frank legal counsel." *Id.* ¶ 30. As this document falls squarely within the parameters of the attorney-client privilege, it is exempt from disclosure under Exemption 5.

## 2. CIA Properly Withheld Information Subject to the Deliberative Process Privilege.

The deliberative process privilege applies to "decisionmaking of executive officials generally," *In re Sealed Case*, 121 F.3d 729, 737, 745 (D.C. Cir. 1997), and "covers documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *U.S. Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001) (internal citation omitted). The privilege "rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news, and its object is to enhance the quality of agency decisions … by protecting open and frank discussion among those who make them within the Government." *Id.* at 8-9 (citations omitted). The privilege also "protects the public from the confusion that would result from premature exposure to discussions occurring before" a final decision has been made, and ensures "the integrity of the decision-making process itself by confirming that officials should be judged by what they decided, not for

matters they considered before making up their minds." *Russell v. Dep't of Air Force*, 682 F.2d 1045, 1048 (D.C. Cir. 1982) (citation omitted).

To come within the scope of the deliberative process privilege, a document must be both predecisional and deliberative. *Coastal States Gas Corp. v. U.S. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980). A document is predecisional if "it was generated before the adoption of an agency policy," and it is deliberative if "it reflects the give-and-take of the consultative process." *Id.* "To establish that a document is predecisional, the agency need not point to an agency final decision, but merely establish what deliberative process is involved, and the role that the documents at issue played in that process." *Judicial Watch v. Exp.-Imp. Bank*, 108 F. Supp. 2d 19, 35 (D.D.C. 2000) (citing *Formaldehyde Inst. v. HHS*, 889 F.2d 1118, 1223 (D.C. Cir. 1989)). The privilege therefore applies broadly to "recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency." *Coastal States*, 617 F.2d at 866. Finally, courts should afford "considerable deference to the agency's judgment as to what constitutes . . . part of the agency give-and-take—of the deliberative process—by which the decision itself is made." *Competitive Enter. Inst. v. U.S. Dep't of Treasury*, 308 F. Supp. 3d 109, 117 (D.D.C. 2018) (citation omitted).

The deliberative process privilege applies to and protects from disclosure Document 4, the legal advice outline discussed above, as well as Documents 1 and 3. Shiner Decl. ¶ 31. The legal advice outline is predecisional to the decisions it is advising on, and is deliberative as it is the personal opinions of the Agency attorney about legal considerations related to the duty to warn. *Id.* ¶¶ 29-30. Like Document 4, Document 3 is an "informal internal outline[] consisting of comments, recommendations, operational proposals, and assessments on aspects of the duty to

warn as it relates to internal policy guidance." *Id.* ¶ 32. Document 1, in turn, is "an inter-agency

email chain providing various considerations and suggestions in response to a specific inquiry

regarding the Agency's policies and procedures related to the duty to warn," and "contains

interim discussions and considerations that feed into a larger decision making process concerning

the implementation of certain policies and procedures related to the duty to warn." *Id.* ¶ 33.[6]

Documents 3 and 4 are also predecisional as to the decisions they are advising on, and likewise

deliberative in that they reflect the personal opinions of their authors as to internal policy

guidance they are interpreting. Each of these records is both pre-decisional and deliberative, and

their disclosure would have "the foreseeable harm" of discouraging and ultimately chilling

deliberation, as well as misleading or confusing the public by disclosing rationales that were not

the basis for the Agency's final decisions." *Id.* ¶ 35. Documents 1, 3, and 4 are thus protected in

full from disclosure by the deliberative process privilege and Exemption 5.

### D.        CIA Properly Withheld Information under Exemption 6

Finally, CIA also redacted from Document 1 certain personal information that is exempt

from disclosure under Exemption 6, which protects "personnel and medical files and similar files

the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5

U.S.C. § 552(b)(6). The Supreme Court has adopted a broad construction of the privacy interests

protected by Exemption 6, emphasizing that "privacy encompass[es] the individual's control of

information concerning his or her person." *DOJ v. Reporters Comm. for Freedom of the Press*,

489 U.S. 749, 763 (1989) (citation omitted). Privacy is of particular importance in the FOIA

---

[6] For the reasons set forth below, Documents 1, 3 and 4 are also withheld in full on the basis of
Exemption 1 because their contents are currently and properly classified.

context because a disclosure required by the FOIA is a disclosure to the public at large. *See Painting & Drywall Work Pres. Fund, Inc. v. HUD*, 936 F.2d 1300, 1302 (D.C. Cir. 1991).

Exemption 6 requires an agency to balance the individual's right to privacy against the public's interest in disclosure. *U.S. Dep't of Air Force v. Rose*, 425 U.S. 352, 372 (1976). The agency must determine whether disclosure of the information threatens a protectable privacy interest; if so, the agency must weigh that privacy interest against the public interest in disclosure, if any. *See Reed v. NLRB*, 927 F.2d 1249, 1251 (D.C. Cir. 1991). The "only relevant public interest … to be weighed in this balance is the extent to which disclosure would serve the core purpose of FOIA, which is contribut[ing] significantly to public understanding of the operations or activities of the government." *DoD v. Fed. Labor Relations Auth.*, 510 U.S. 487, 495 (1994). Plaintiff bears the burden of demonstrating disclosure would serve this interest. *See Carter v. U.S. Dep't of Commerce*, 830 F.2d 388, 391-92 nn. 8 & 13 (D.C. Cir. 1987).

CIA properly applied these principles to "withhold names and personally identifying details of CIA personnel contained in Document 1." Shiner Decl. ¶ 37. As set forth in the Shiner Declaration, the CIA personnel identified in this document have a substantial privacy interest in not having their identities and/or contact information disclosed, because such disclosure, in the broader context of the high-profile subject matter of this case, "could subject them to harassment or unwanted contact by the media." *Id.* ¶ 37. Conversely, disclosure of these identities would shed no light on CIA operations or activities. *Id.* ¶ 38. Accordingly, the Court should also uphold CIA's Exemption 6 withholdings.

### E.     CIA Processed and Released All Reasonably Segregable Information

FOIA requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this

subsection." 5 U.S.C. § 552(b)(9). But an agency need not disclose records in which the nonexempt information remaining is meaningless. *See Nat'l Sec. Archive Fund, Inc. v. CIA*, 402 F. Supp. 2d 211, 220-21 (D.D.C. 2005) (concluding that no reasonably segregable information existed, where "the non-exempt information would produce only incomplete, fragmented, unintelligible sentences composed of isolated, meaningless words."). "Agencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material." *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007). And as with other aspects of its review under FOIA, a court "may rely on government affidavits that show with reasonable specificity why documents withheld pursuant to a valid exemption cannot be further segregated." *Juarez v. DOJ*, 518 F.3d 54, 61 (D.C. Cir. 2008).

Here, CIA conducted a careful, line-by-line review of each responsive document, and withheld information only after they concluded that there was no reasonably segregable factual or non-exempt information responsive to the request. Shiner Decl. ¶ 39. As there are no facts rebutting the presumption that CIA complied with its segregability obligations—and indeed, Defendants do not understand CPJ to be disputing this issue—CIA is entitled to summary judgment on that issue as well.

## II.   Defendants' *Glomar* Responses to Parts 2, 3, and 4 of CPJ's FOIA Request Are Proper under Exemptions 1 and 3.

As explained, each of the Defendants interposed a *Glomar* response to Parts 2 and 3— and, in the case of ODNI only, also as to Part 4—of CPJ's FOIA request. As set forth below, the subject matter, context, and timeframe of these requests justify Defendants' respective *Glomar* responses under both Exemption 1 and Exemption 3.

A.     **The Existence or Non-Existence of Responsive Records Is a Currently and Properly Classified Fact.**

Defendants properly invoked their *Glomar* responses under Exemption 1 in order to safeguard a currently and properly classified fact—"namely, whether the duty to warn was implicated in connection with Jamal Khashoggi," which would be revealed by merely confirming or denying the existence of records responsive to Parts 2, 3, or 4 of the requests. Shiner Decl. ¶ 43; *see also* Exec. Order 13526 § 3.6(a) (expressly providing that "[a]n agency may refuse to confirm or deny the existence or nonexistence of requested records whenever the fact of their existence or nonexistence is itself classified under this order or its predecessors."). As set forth below, all of the procedural and substantive requirements of Executive 13526 are satisfied by Defendants' Exemption 1 *Glomar* responses.

Initially, the existence or non-existence of records responsive to Parts 2, 3—and in the case of ODNI, also Part 4—is a fact that "pertains to" "intelligence activities (including covert action), intelligence sources or methods," one of the eight protected categories listed in Section 1.4 of Executive Order 13526. Exec. Order No. 13526 § 1.4(c); *see also Judicial Watch, Inc*, 715 F.3d at 941 (noting that "'pertains' is 'not a very demanding verb.'") (citation omitted). As explained above, IC Directive 191 establishes a consistent, coordinated approach for how the IC will provide warning of intentional killing, serious bodily injury, and kidnapping to specific individuals or groups. It establishes the policy that "[a]n IC element that collects or acquires credible and specific information indicating an impending threat of intentional killing, serious bodily injury, or kidnapping" directed at an intended victim shall have the duty to warn the intended victim or those responsible for protecting the intended victim, as appropriate. ICD-191 § E. As noted previously, the directive requires that each IC element  designate "senior officers"

23

"responsible for reviewing threat information initially determined to meet duty to warn requirements to affirm whether the information is credible and specific, so as to permit a meaningful warning." *Id.* § F.2. And pursuant to IC Directive 191, each IC element also must "document and maintain records" on various specified "duty to warn actions," including, *inter alia*, "senior officer reviews of threat information and determinations," and "justifications not to warn an intended victim based on waiver criteria" identified in the Directive. ICD-191 § 13.

While there are various nuances to the standards and procedures set forth by IC Directive 191, the crucial point for the purposes of Defendants' *Glomar* responses is that none of these procedures are triggered—and, thus, no "duty to warn actions" are taken, much less documented as required by § F.13—in the absence of an IC element "collect[ing] or acquir[ing] credible and specific information indicating an impending threat of intentional killing, serious bodily injury, or kidnapping[.]" ICD-191 § E. In other words, because the duty to warn process under Directive 191 is triggered, at a minimum, only when a member of the Intelligence Community "collects or acquires credible and specific information indicating an impending threat of intentional killing, serious bodily injury, or kidnapping directed at a person or group of people," ICD-191 § E, acknowledging the existence of records concerning the duty to warn under Directive 191 as it relates to a particular person, would necessarily acknowledge the existence of intelligence information about the particular person at a particular time.

Thus, as each of the agency Defendants' respective supporting declarations explains, to acknowledge the existence of records responsive to Parts 2, 3, and 4 of CPJ's FOIA request— each of which seeks categories of records related to IC Directive 191 *as it may have been applied to Mr. Khashoggi*—would necessarily acknowledge the existence of *intelligence information collected by the U.S. Intelligence Community from specific individual(s) who may have*

discussed a specific threat against Mr. Khashoggi. Conversely, acknowledging that no responsive

records exist could reveal a lack of such intelligence information, tending to reveal, for example,

either a lack of intelligence interest in particular individuals or collection gaps against certain

targets. Either way, the information is squarely protected by Exemptions 1 and 3.

As the ODNI declaration, for example, explains: "the information sought [by Parts 2, 3,

and 4 of the FOIA request] would only exist if underlying information that would trigger actions

under [IC Directive 191] were collected by the IC through surveillance efforts targeted at

particular individuals or entities that were discussing Mr. Khashoggi during a specific period of

time." Gaviria Decl. ¶ 22. Thus, "the existence of records regarding any steps taken by the IC

under the duty to warn policy would necessarily confirm the existence of records about Mr.

Khashoogi," and the disclosure of the same would "tend[] to reveal the ODNI and the IC's

interest in particular individuals or entities"—which could, in turn, "alert them that certain

intelligence sources or methods are being employed by specific elements of the IC to collect

information on them." *Id*. For example,

> if a particular individual who is a target of IC surveillance mentioned Mr.
> Khashoggi and very specific information about him (*e.g.*, and intent to harm Mr.
> Khashoggi) when that individual was using a particular method of
> communication, that individual would learn that they were being surveilled during
> a specific period of time and what method the IC was using to surveil them.

*Id.*; *accord* Shiner Decl. ¶ 44 (explaining that confirming "[t]he existence of responsive records

[to Parts 2 or 3] would indicate that the CIA … possessed threat information in advance of

Khashoggi's death. This fact, in turn, would tend to reveal, at minimum, targets of intelligence

collection at a given point in time and could also reveal sources, capabilities, resources, and/or

relationships with domestic or foreign entities."); Hardy Decl. ¶ 35 (similar); Kiyosaki Decl. ¶¶

19-20 (similar).

25

"Conversely, disclosing that the Agency had no records on the subject would tend to reveal a blind spot in the U.S. Government's intelligence acquisition. The presence or absence of records on this subject would be of great interest to adversaries—who could attempt to hinder intelligence collection efforts and exploit blind spots." Shiner Decl. ¶ 44; *see also* Kiyosaki Decl. ¶ 19 ("[D]enying the existence of responsive records would tend to indicate a lack or dearth of underlying intelligence information. Disclosing this information could reveal gaps in IC capabilities, the success of evasive tactics taken by adversaries, and/or IC intelligence collection priorities."); Hardy Decl. ¶ 35 (similar); Gaviria Decl. ¶ 22 (similar). Thus, the existence or non-existence of records responsive to Parts 2, 3, or 4 of CPJ's FOIA request is a fact that "pertains to" "intelligence activities (including covert action), intelligence sources or methods," under Section 1.4(c) of Executive Order 13526, and the agency declarants have "determine[d] that the … disclosure of the information reasonably could be expected to result in damage to the national security." Exec. Order 13526 § 1.1(a)(4); Shiner Decl. ¶ 41-45; Kiyosaki Decl. ¶¶ 17-24; Hardy Decl. ¶¶ 25-38; Gaviria Decl. ¶¶ 14-26.[7]

As discussed *supra*, the agency declarations are entitled to substantial deference. *See*, *e.g.*, *Fitzgibbon*, 911 F.2d at 766 (holding that the district court erred in "perform[ing] its own calculus as to whether or not harm to the national security or to intelligence sources and methods would result from disclosure"). In according such deference, "a reviewing court must take into

---

[7] Defendants' *Glomar* responses also satisfy the remaining conditions of Executive Order 13526. All of the declarants are original classification authorities qualified to and vested with the authority to classify information. Exec. Order 13526 § 1.1(a)(1); Shiner Decl. ¶ 2; Kiyosaki Decl. ¶ 2; Hardy Decl. ¶ 2; Gaviria Decl. ¶¶ 17. Any records (if any exist) responsive to CPJ's requests concerning the duty to warn Mr. Khashoggi under Directive 191 and held by the Defendant agencies would, necessarily, be "owned by, produced by or for, or … under the control of the United States Government." Exec. Order No. 13526 § 1.1(a)(2).

account … that any affidavit or other agency statement of threatened harm to national security will always be speculative to some extent, in the sense that it describes a potential future harm." *Wolf*, 473 F.3d at 374 (citation omitted). Further, the Government routinely asserts *Glomar* responses to analogous requests for information about particular surveillance subjects, and Courts routinely uphold such responses as impermissibly "pertaining to" "intelligence activities (including covert action), intelligence sources or methods under Section 1.4(c) of Executive Order 13526. *See*, *e.g.*, *Competitive Enter. Inst. v. NSA*, 78 F. Supp. 3d 45, 60 (D.D.C. 2015) (upholding NSA *Glomar* response to request for metadata records with respect to two particular individuals); *Agility Pub. Warehousing Co. K.S.C. v. NSA*, 113 F. Supp. 3d 313, 329 (D.D.C. 2015) (upholding NSA *Glomar* in response to request for particular surveillance records).

"Ultimately, an agency's justification for invoking a FOIA exemption,' whether directly or in the form of a *Glomar* response, 'is sufficient if it appears logical or plausible.'" *ACLU v. CIA*, 710 F.3d at 427 (citation omitted). That standard is easily satisfied here, and based on Defendants' declarations, "the sensitive information about intelligence activities, priorities, sources, and methods" implicated by Parts 2, 3, and 4 of CPJ's FOIA request, Gaviria Decl. ¶ 23, and the deference owed to national security officials in this context, the Court should uphold Defendants' Exemption 1 *Glomar* responses.

**B.**     **Defendants' *Glomar* Responses Are Independently Justified under Exemption 3.**

Defendants' *Glomar* responses are also independently justified under FOIA Exemption 3. Defendants' Exemption 3 *Glomar* responses are supported by the respective statutes discussed below, each of which provides an independent basis for the entry of summary judgment in the corresponding Defendant's favor.

1. **Defendants' Exemption 3 *Glomar* Responses Are Supported by Section 102A(i)(1) of the National Security Act of 1947.**

First, Defendants properly asserted an Exemption 3 *Glomar* response as to Parts 2 and 3—and, in the case of ODNI only, also as to Part 4—of CPJ's FOIA request on the basis of Section 102A(i)(1) of the National Security Act of 1947, 50 U.S.C. § 3024(i)(1). As explained above, this Act's qualification as an Exemption 3 statute is a matter of black-letter law. *ACLU v. DoD*, 628 F. 3d at 619. As also explained, as amended, Section 102A(i)(1) provides that the Director of National Intelligence "shall protect intelligence sources and methods from unauthorized disclosure," 50 U.S.C. § 3024(i)(1), and the Supreme Court has expressly acknowledged the "wide-ranging authority" conferred by this provision, *Sims*, 471 U.S. at 177.

Here, Defendants are members of the Intelligence Community, and as such must protect intelligence sources and methods. 50 U.S.C. § 3024(i)(1). And, for much the same reasons as explained above with respect to each Defendant's Exemption 1 *Glomar* response, each Defendant's declarant has attested that acknowledging the existence or non-existence of records responsive to Parts 2 and 3—and, in the case of ODNI, also Part 4—of CPJ's FOIA request would run afoul of Section 102A(i)(1) by tending to reveal exactly such information. *See supra* Section II.A; Shiner Decl. ¶ 46; Kiyosaki Decl. ¶ 27; Hardy Decl. 43; Gaviria Decl. ¶¶ 29. Thus, Defendants have properly asserted Exemption 3 *Glomar* responses pursuant to the National Security Act.

2. **NSA's Exemption 3 *Glomar* Response is Additionally Supported by the National Security Agency Act of 1959 and 18 U.S.C. § 798.**

Finally, NSA's Exemption 3 *Glomar* response is additionally supported by two other independent statutory authorities. First, NSA's statutory privilege is set forth in Section 6 of the National Security Agency Act of 1959, 50 U.S.C. § 3605(a). Section 6 provides that "[n]othing

in this chapter or any other law … shall be construed to require the disclosure of the organization

or any function of the National Security Agency, or any information with respect to the activities

thereof." By this language, Congress expressed its finding that disclosure of any information

relating to NSA activities is potentially harmful. The courts have held that the protection

provided by this statute is, by its very terms, absolute. *See*, *e.g.*, *Linder v. NSA*, 94 F.3d 693

(D.C. Cir. 1996). Second, Section 798 of Title 18 prohibits the unauthorized disclosure of

classified information: (i) concerning the communications intelligence activities of the United

States, or (ii) obtained by the process of communications intelligence derived from the

communications of any foreign government. The term "communications intelligence," as defined

by Section 798, means the "procedures and methods used in the interception of communications

and the obtaining of information from such communications by other than the intended

recipients." *Larson*, 565 F.3d at 868.

The Kiyosaki Declaration properly establishes that "acknowledging the existence or non-

existence of responsive records to Parts 2 and 3 of Plaintiff's request would reveal information

about NSA's functions and activities," Kiyosaki Decl. ¶ 28 (citing 50 U.S.C. § 3605). It further

and independently establishes, with respect to Part 2 of the request, that "confirming or denying

the existence of responsive records would reveal information about the existence or non-

existence of underlying NSA [communications intelligence]," because "[t]he duty to warn, as set

forth in ICD 191, could only be triggered by the existence of intelligence information—and, with

respect to NSA specifically, [communications intelligence]." *Id.* ¶ 29. Thus, "[c]onfirming the

existence of responsive records would necessarily confirm that NSA collected relevant

[communications intelligence] [and] denying the existence of responsive records would indicate

a lack or dearth of [communications intelligence]," the disclosure of which is prohibited by 18 U.S.C. § 798. *Id.*

Accordingly, each of these statutes provides an additional and independent ground supporting the entry of summary judgment in NSA's favor as to its *Glomar* response under Exemption 3.

## <u>CONCLUSION</u>

For all the foregoing reasons, Defendants respectfully request that the Court grant their motion for summary judgment and enter judgment in their favor on all claims.


Respectfully submitted,


JOSEPH H. HUNT
Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director

_____/s/_____
Antonia Konkoly
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW, Room 11110
Washington, DC 20005
(202) 514-2395 (direct)
(202) 616-8470
antonia.konkoly@usdoj.gov

*Counsel for the Defendants*

DATED: August 28, 2019