# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

KNIGHT FIRST AMENDMENT
INSTITUTE AT COLUMBIA
UNIVERSITY,

COMMITTEE TO PROTECT
JOURNALISTS,

　　　　　　Plaintiffs,

　　v.

CENTRAL INTELLIGENCE AGENCY, *et
al.*,

　　　　　　Defendants.

Civil Action No. 1:18-cv-2709 (TNM)

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

PLEASE TAKE NOTICE that, upon the accompanying Memorandum of

Points and Authorities, Declaration of Alexandra P. Swain, and Statement of Material

Facts, upon all prior pleadings and proceedings herein, the undersigned, attorneys for

Committee to Protect Journalists ("CPJ"), hereby moves this Court for an order granting

Plaintiff CPJ's motion for summary judgment, denying the motion for summary

judgment made by Defendants Central Intelligence Agency ("CIA"), Federal Bureau of

Investigation ("FBI"), National Security Agency ("NSA"), and the Office of the Director

of National Intelligence ("ODNI"), and for such other and further relief as the Court may

deem just and proper on the grounds that there is no genuine issue of disputed material

fact and that it is entitled to judgment as a matter of law.  The reasons supporting this

motion are set forth in the concurrently filed memorandum.

Dated: New York, NY                          Respectfully submitted,
       September 26, 2019

                                     /s/ Timothy K. Beeken
                               Timothy K. Beeken (NY0083)
                               Jeremy Feigelson (admitted *pro hac vice*)
                               Alexandra P. Swain (admitted *pro hac vice*)
                               DEBEVOISE & PLIMPTON LLP
                               919 Third Avenue
                               New York, NY 10022
                               (212) 909-6000
                               tkbeeken@debevoise.com
                               jfeigelson@debevoise.com
                               apswain@debevoise.com

                               *Counsel for Plaintiff Committee to Protect*
                                   *Journalists*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA UNIVERSITY, COMMITTEE TO PROTECT JOURNALISTS, <br><br> Plaintiffs, <br><br> v. <br><br> CENTRAL INTELLIGENCE AGENCY, *et al.*, <br> Defendants. | Civil Action No. 1:18-cv-2709 (TNM) <br><br> **ORAL ARGUMENT REQUESTED** |

**MEMORANDUM OF POINTS AND AUTHORITIES OF PLAINTIFF COMMITTEE TO PROTECT JOURNALISTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Timothy K. Beeken
(tkbeeken@debevoise.com)
Jeremy Feigelson (admitted *pro hac vice*)
(jfeigelson@debevoise.com)
Alexandra P. Swain (admitted *pro hac vice*)
(apswain@debevoise.com)

DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022
(212) 909-6000

September 26, 2019

*Counsel for Plaintiff Committee to Protect Journalists*

## TABLE OF CONTENTS

Preliminary Statement................................................................................................... 2

Undisputed Facts........................................................................................................... 5

I.     The Brutal Murder of U.S. Journalist Jamal Khashoggi................................ 5

II.    The U.S. Government's Public Denial of Any Prior Knowledge Triggering Its Duty to Warn Mr. Khashoggi and Investigative Press Reports To The Contrary.................................................................................................... 9

III.   Bipartisan and Global Demand for Investigation and Transparency ....................... 12

IV.   CPJ's Narrow FOIA Requests and the Government's *Glomar* Responses ............. 17

Argument ...................................................................................................................... 21

I.     Summary Judgment for CPJ Is in Order, Given the Government's Public Statements Outside This Litigation .................................................................. 22

   A.  The Government Has Publicly Denied Prior Knowledge Regarding the Threat to Mr. Khashoggi ...................................................................................... 22

   B.  The Government Has Publicly Acknowledged That It Has Documents Related To The Murder ................................................................................................... 24

II.    The Government Has Failed To Show Cognizable Harm Under Either Claimed FOIA Exemption Because CPJ's Requests Do Not Require Disclosure Of Intelligence Activities, Sources, Or Methods. ....................................... 25

   A.  The Subject of CPJ's FOIA Requests Is Not "Properly Classified" and Therefore Not Exempt from Disclosure Under Exemption 1............................................. 25

   B.  Exemption 3 Does Not Justify the Government's *Glomar* Responses. ......................... 31

III.   The Public Record Suggests that the Government Is Relying on *Glomar* to Avoid Embarrassment, Which Is Not a Proper Basis for Nondisclosure................. 38

IV.   As An Alternative, The Court Can And Should Require More Detailed Affidavits From The Government As Well As *In Camera* Review Of Responsive Documents. ....................................................................................... 42

Conclusion ................................................................................................................... 44

## PRELIMINARY STATEMENT

The brutal murder of journalist Jamal Khashoggi by the Saudi Arabian government has sparked an extraordinary global demand for greater transparency into this terrible event.  The consensus view that more facts are urgently needed reaches across national borders and across party lines.  As another federal court has noted in ruling for greater responsiveness to Freedom of Information Act ("FOIA") requests, Mr. Khashoggi's killing is "a subject of considerable public importance."  *Open Soc'y Justice Initiative v. CIA*, Nos. 19 Civ. 234 (PAE), 19 Civ. 1329 (PAE), 2019 WL 3561889 (S.D.N.Y. Aug. 6, 2019) (ordering dramatically increased pace of response to FOIA requests about the killing).

In this FOIA case, plaintiff Committee to Protect Journalists ("CPJ") seeks to shine a light on one crucial but largely unexplored piece of the story:  Did U.S. government agencies know in advance of the threat to Mr. Khashoggi's life and liberty, and if so, did they comply with their duty to warn him pursuant to Intelligence Community Directive 191 ("Directive 191")?  The government has publicly and summarily denied advance knowledge.  CPJ, pursuant to its mission as a leading global advocate for press freedom, seeks to test that denial against the actual documentary record.

CPJ made narrowly targeted FOIA requests on this issue to remaining Defendants the Central Intelligence Agency ("CIA"), the Federal Bureau of Investigation ("FBI"), the National Security Agency ("NSA"), and the Office of the Director of National Intelligence ("ODNI") (collectively the "Defendants" or the "Government"). With appropriate limited redactions, Defendants could readily provide a substantive response to CPJ without disclosing sensitive intelligence details.  Yet Defendants all have responded instead with rote refusals to even

confirm or deny the existence of responsive records.  In FOIA parlance these are "*Glomar*"

responses, based on the case law arising out of the government's denial of records regarding the

CIA spy ship the Hughes Glomar Explorer.  *See Phillippi v. CIA*, 546 F.2d 1009 (D.C. Cir.

1976).

The government's rote *Glomar* responses are inadequate in this exceptional case.  The

purpose of FOIA is "to pierce the veil of administrative secrecy and to open agency action to the

light of public scrutiny."  *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976) (quoting *Rose v.

Dep't of Air Force*, 495 F.2d 261, 263 (2d Cir. 1974).  Across-the-board *Glomar* responses

ignore both the real-world circumstances of this case, where so much is already known and the

demand for more knowledge is so legitimate and so intense.  Defendants' *Glomar* responses also

ignore the governing law:  Defendants have not carried their burden of showing that

acknowledging the existence or nonexistence of responsive records would cause them to suffer

cognizable harm under a FOIA exemption.  *See, e.g., Bartko v. U.S. Dep't of Justice*, 898 F.3d

51, 63 (D.C. Cir. 2018) ("A *Glomar* response to a FOIA request is permitted in that rare situation

when either confirming or denying the very existence of records responsive to a request would

'cause harm cognizable under an FOIA exception.'") (quoting *Roth v. U.S. Dep't of Justice*, 642

F.3d 1161, 1178 (D.C. Cir. 2011)).

There is no merit to the proposition that acknowledging the existence or nonexistence of

the requested documents will somehow do damage to national security interests.  Intelligence

sources and methods need not be disclosed in response to CPJ's requests.  The amount of

information already known to the public is exceptional and the increment sought here is limited:

- ***The Department of State has already publicly denied any prior knowledge by the U.S. government of the threat to Mr. Khashoggi's life***.  That statement, taken at face value, simply defeats the Government's own litigation position here.  If the statement is true, then defendants can simply say here that they have no responsive documents, and the public position of the Government remains exactly the same.  If that statement is false (as investigative reports by leading media organizations suggest), then—not to mince words—the Government has lied to the American people, and the *Glomar* responses here are part of a cover-up.  Additionally, both the CIA and the ODNI have acknowledged that they have "records relating to the killing of U.S. resident Jamal Khashoggi, including but not limited to the CIA's findings on and/or assessment of the circumstances under which he was killed and/or the identities of those responsible," *Open Soc'y Justice Initiative v. CIA*, No.  1:19-cv-00234-PAE, ECF No. 1 (S.D.N.Y. Jan.  9, 2019) in separate litigation.  *See  id.* at ECF No. 99 "Joint Status Letter"  (Sept. 24, 2019).

- Culpability at the highest levels of the Saudi government is well established.  Senior congressional leaders stepped out of a CIA briefing to announce that the Crown Prince was guilty of murder.  The President of the United States has all but agreed with that assessment, openly brushing aside human rights concerns in favor of Saudi purchases of U.S. weapons.

- There is ample reason to believe that the government is seeking here not to protect intelligence sources and methods, but simply to avoid embarrassment—a rationale

that is legally insufficient to justify classification of records.  The Government

undoubtedly does not wish to discuss publicly what the world already knows:

namely that this country and its allies routinely spy on each other.  Given the

global concerns about of the lackadaisical U.S. response to the murder, the

Government also undoubtedly seeks to avoid further scrutiny of its efforts—or

lack thereof—to protect Mr. Khashoggi.

The intelligence agencies should be ordered to acknowledge whether or not they have

responsive documents, and, if they do, to produce them.  To the extent that details of intelligence

sources and methods are actually at stake, they can be protected through limited redactions.  At

bare minimum, Defendants should be ordered to supplement their declarations with additional

detail and to produce responsive documents, if they exist, for *in camera* review.


### UNDISPUTED FACTS

### I.     The Brutal Murder of U.S. Journalist Jamal Khashoggi

Jamal Khashoggi was a U.S. resident, a Saudi dissident, and an internationally recognized

journalist known for his human rights and press freedom advocacy in the Middle East.  As a

columnist for *The Washington Post*[1] and editor-in-chief of Al-Arab News Channel,

Mr. Khashoggi regularly authored articles featuring criticisms of the Saudi government, and in

particular of the Saudi Crown Prince Mohammed bin Salman (the "Crown Prince").  Fearing

---

[1]    Donna Abu-Nasr, *Who is Jamal Khashoggi?  A Saudi Insider Who Became an Exiled Critic*,
       Bloomberg (Oct. 10, 2018, 9:00 PM), https://www.washingtonpost.com/business/who-is-
       jamal-khashoggi-a-saudiinsider-who-became-an-exiled-critic/2018/10/10/40f13dc4-ccf1-
       11e8-ad0a-0e01efba3cc1_story.html.

retaliation from the Saudi regime, Mr. Khashoggi fled Saudi Arabia.  As a result, the Crown

Prince repeatedly sought to bring Mr. Khashoggi back to Saudi Arabia.[2]  After the Crown

Prince's efforts failed, he instructed his top aide Saud al-Qahtani to arrange for Mr. Khashoggi to

be killed.[3]

     Approximately a week and a half before his 60th birthday, on October 2, 2018,

Mr. Khashoggi arrived at the Saudi consulate in Istanbul, Turkey to obtain documentation for his

upcoming marriage to his Turkish fiancé Hatice Cengiz.[4]  Upon his arrival, a team of fifteen

Saudi agents, led by Saud al-Qahtani, grabbed Mr. Khashoggi and tied him up.[5]  The Saudi

agents injected Mr. Khashoggi with an unknown heavy sedative then began suffocating him with

---

[2]    Josh Lederman, *Khashoggi Met with Crown Prince's Brother Amid Efforts to Return Him to Saudi Arabia*, NBC News (Oct. 22, 2018, 5:13 PM), https://www.nbcnews.com/news/mideast/khashoggi-met-crown-prince-s-brother-amid-efforts-return-him-n923031.

[3]    Warren B. Strobel, *CIA Intercepts Underpin Assessment Saudi Crown Prince Targeted Khashoggi*, Wall St. J. (Dec. 1, 2018, 1:33 AM), https://www.wsj.com/articles/cia-intercepts-underpin-assessment-saudi-crown-prince-targeted-khashoggi-1543640460; *see also* Julian E. Barnes & Eric Schmitt, *Intercepts Solidify C.I.A. Assessment That Saudi Prince Ordered Khashoggi Killing*, N.Y. Times (Dec. 2, 2018), https://www.nytimes.com/2018/12/02/us/politics/crown-prince-mohammed-qahtani-intercepts.html.

[4]    Bethan McKernan, *Jamal Khashoggi was Worried About Consulate Visit, Says Fiancee* (Oct. 26, 2018, 10:22 AM), https://www.theguardian.com/world/2018/oct/26/jamal-khashoggi-was-worried-about-consulate-visit-says-fiancee.

[5]    Stephanie Kirchgaessner & Nick Hopkins, *US urges Saudi Prince to Ditch Aide Linked to Khashoggi Killing*, The Guardian (Apr. 12, 2019, 1:00 AM), https://www.theguardian.com/world/2019/apr/12/us-urges-saudi-prince-to-ditch-aide-linked-to-khashoggi-killing;  Ben Hubbard & David D. Kirkpatrick, *Saudis Shift Account of Khashoggi Killing Again, as 5 Agents Face Death Penalty*, N.Y. Times (Nov. 15, 2018), https://www.nytimes.com/2018/11/15/world/middleeast/saudi-arabia-khashoggi-death-penalty.html.

a plastic bag.[6]  Audio transcriptions, released by Turkish intelligence agencies, established that

Mr. Khashoggi struggled and repeatedly pleaded for his life while the Saudi agents strangled

him.[7]  Next, according to Turkish officials, the Saudi agents began to mutilate Mr. Khashoggi's

body with a bone saw, a surgical instrument manually used in forensics, torture, and

dismemberment.[8]  It is unclear if Mr. Khashoggi was alive or conscious during the

dismemberment process.[9]  The current whereabouts of his remains are unconfirmed.[10]

When Mr. Khashoggi failed to emerge from the consulate, his fiancé contacted the

Turkish police.[11]  The Turkish police and a prosecutor initiated an investigation into his

---

[6]   Jackie Northam, *U.N. Report Implicates Saudi Crown Prince in Killing of Jamal Khashoggi*, NPR (Jun. 19, 2019, 5:06 PM), https://www.npr.org/2019/06/19/734157980/u-n-report-implicates-saudi-crown-prince-in-killing-of-jamal-khashoggi.

[7]   *Saudi Hit Squad's Gruesome Conversations During Khashoggi's Murder Revealed*, Daily Sabah (Sep. 9, 2019, 2:49 PM), https://www.dailysabah.com/investigations/2019/09/09/saudi-hit-squads-gruesome-conversations-during-khashoggis-murder-revealed.

[8]   Ben Hubbard, *One Killing, Two Accounts: What We Know About Jamal Khashoggi's Death*, N.Y. Times (Oct. 20, 2018), https://www.nytimes.com/2018/10/20/world/middleeast/khashoggi-turkey-saudi-narratives.html.

[9]   *Saudi Hit Squad's Gruesome Conversations During Khashoggi's Murder Revealed*, Daily Sabah (Sep. 9, 2019, 2:49 PM), https://www.dailysabah.com/investigations/2019/09/09/saudi-hit-squads-gruesome-conversations-during-khashoggis-murder-revealed.

[10]  *Id*.

[11]  Kareem Fahim, *Turkey Concludes Saudi Journalist Jamal Khashoggi Killed by "Murder" Team, Sources Say*, Wash. Post (Oct. 6, 2018), https://www.washingtonpost.com/world/middle_east/turkey-concludes-saudi-journalist-khashoggi-killed-by-murder-team-sources-say/2018/10/06/31ee4f86-c8d9-11e8-9c0f-2ffaf6d422aa_story.html.

disappearance.[12]  Shortly thereafter, reports began speculating that Mr. Khashoggi had been killed inside the consulate.

Three days later, on October 5, 2018, the Crown Prince informed Bloomberg News that Mr. Khashoggi left the Saudi consulate "after a few minutes or one hour";  he added, "We have nothing to hide."[13]  The next day, the Saudi consulate's Consul General responded that, "talk of [Khashoggi's] kidnapping was baseless."[14]

On October 10, 2018, the Turkish media released images of the fifteen-member team of Saudi agents allegedly responsible for Mr. Khashoggi's execution.[15]  Media outlets continued to report that Mr. Khashoggi had been killed.  Finally, on October 20, 2018, after conflicting narratives, the Saudi government conceded that Mr. Khashoggi was killed in their consulate and

---

[12]   Carlotta Gall, *Turkey Searches Saudi-Owned Mansion for Evidence in Khashoggi Case*, N.Y. Times (Nov. 26, 2018), https://www.nytimes.com/2018/11/26/world/europe/turkey-saudi-arabia-khashoggi.html.

[13]   Benjamin Mueller, *Khashoggi's Death Is Explained by the Saudis in Five Acts (and Counting)*, N.Y. Times (Oct. 25, 2018), https://www.nytimes.com/2018/10/25/world/middleeast/saudi-trump-jamal-khashoggi.html.

[14]   *How the Saudi Narrative of Khashoggi's Killing Changed*, Al Jazeera (Nov. 15, 2018), https://www.aljazeera.com/news/2018/10/saudi-narrative-khashoggi-killing-changed-20-days-181020082300134.html.

[15]   *Jamal Khashoggi: Turkish Media Says Video Shows Disappearance Plot*, BBC News (Oct. 10, 2018), https://www.bbc.com/news/world-europe-45809470.

that an investigation was underway.[16]  The following month, the CIA concluded that the Crown Prince likely ordered Mr. Khashoggi's killing.[17]

## II.  The U.S. Government's Public Denial of Any Prior Knowledge Triggering Its Duty to Warn Mr. Khashoggi and Investigative Press Reports To The Contrary

This case centers on the Intelligence Community's contention that it would harm the national interest even to acknowledge whether there are or are not records related to the duty to warn Mr. Khashoggi.  Yet, shortly after Mr. Khashoggi's murder, the U.S. Department of State deputy spokesman clearly stated in a public forum that "***the United States had no advanced knowledge of Jamal Khashoggi's disappearance***" (emphasis added).[18]  The statement was unqualified, made on behalf of the United States generally, and did not purport to be limited to any particular agency or agencies.

This broad government denial was highly significant because the Intelligence Community, pursuant to Intelligence Community Directive 191, has a duty to warn individuals or groups about threats of intentional killing, serious bodily injury, and kidnapping.[19]  Directive 191 provides broadly that any U.S. intelligence agency "that collects or acquires credible and specific information indicating an impending threat of intentional killing, serious bodily injury,

---

[16]   *Jamal Khashoggi Case:  Saudi Arabia Says Journalist Killed in Fight*, BBC News (Oct. 20, 2018), https://www.bbc.com/news/world-middle-east-45923217.

[17]   Warren B. Strobel, *CIA Intercepts Underpin Assessment Saudi Crown Prince Targeted Khashoggi*, Wall St. J. (Dec. 1, 2018, 1:33 AM), https://www.wsj.com/articles/cia-intercepts-underpin-assessment-saudi-crown-prince-targeted-khashoggi-1543640460.

[18]   Office of the Spokesperson, Department Press Briefing, U.S. Dep't of State (Oct. 10, 2018), https://www.state.gov/briefings/department-press-briefing-october-10-2018/.

[19]   Office of the Dir. of Nat'l Intelligence, Intelligence Community Directive 191, § E.1 (Jul. 21, 2015), https://fas.org/irp/dni/icd/icd-191.pdf.

or kidnapping directed at a person or group of people (hereafter referred to as intended victim) shall have a duty to warn the intended victim or those responsible for protecting the intended victim, as appropriate."[20]

Directive 191 equally applies to both U.S. persons and non-U.S. persons, and includes "threats where the target is an institution, place of business, structure, or location."[21]  Further, Directive 191 requires Intelligence Community elements to "document and maintain records" in relation to actions taken pursuant to the duty to warn, including "justifications not to warn an intended victim based on waiver criteria identified in [the] Directive."[22]

Thorough and apparently credible investigative news reports from leading media organizations indicate that a year before the assassination, U.S. intelligence agencies intercepted communications between the Crown Prince and one of his senior aides relaying a threat to Mr. Khashoggi's life and a plot to kill him.[23]  *The Wall Street Journal* reported that the CIA had

---

[20]   *Id*.

[21]   *Id*.

[22]   Office of the Dir. of Nat'l Intelligence, Intelligence Community Directive 191, § F.13 (Jul. 21, 2015), https://fas.org/irp/dni/icd/icd-191.pdf.  These actions also include "[t]he methods, means, and substance of any warning given by the [Intelligence Community] element"; "[s]enior officer reviews of threat information and determinations";  "[c]oordination with the FBI, or CIA . . . to determine how best to pass threat information to the intended victim"; "[d]ecisions to inform the intended victim in light of exigent circumstances that preclude prior consultation";  "[c]ommunication of threat information to another [Intelligence Community] element or U.S. government agency for delivery to the intended victim";  and "[n]otification to the originating [Intelligence Community] element of how and when threat information was delivered to the intended victim."  *Id.*

[23]   Mark Mazzetti, *Year Before Killing, Saudi Prince Told Aide He Would Use "a Bullet" on Jamal Khashoggi*, N.Y. Times (Feb. 7, 2019), https://www.nytimes.com/2019/02/07/us/politics/khashoggi-mohammed-bin-salman.html.

identified at least eleven messages from the Crown Prince to Saud al-Qahtani in the time leading up to and after Mr. Khashoggi's murder.[24] *The Washington Post* also reported that information about Mr. Khashoggi being targeted had "been disseminated throughout the U.S. government and was contained in reports that are routinely available to people working on U.S. policy toward Saudi Arabia or related issues."[25]

In the communications dated August 2017, Crown Prince Mohammed bin Salman allegedly told his associates that if further efforts to persuade Mr. Khashoggi to return were not successful, they "could possibly lure him outside Saudi Arabia and make arrangements."[26] According to another conversation from August 2017 that was intercepted by U.S. intelligence agencies, the Crown Prince told an aide he would use "a bullet" on Mr. Khashoggi if the journalist did not go back.[27]

---

[24]  Strobel, *CIA Intercepts Underpin Assessment Saudi Crown Prince Targeted Khashoggi*, Wall St. J. (Dec. 1, 2018, 1:33 AM), https://www.wsj.com/articles/cia-intercepts-underpin-assessment-saudi-crown-prince-targeted-khashoggi-1543640460.

[25]  Philip Bump, *What We Know About What the Government Knows About Jamal Khashoggi's Disappearance*, Wash. Post (Oct. 17, 2018), https://beta.washingtonpost.com/politics/2018/10/17/what-we-know-about-what-government-knows-about-jamal-khashoggis-disappearance/.

[26]  Warren B. Strobel, *CIA Intercepts Underpin Assessment Saudi Crown Prince Targeted Khashoggi*, Wall St. J. (Dec. 1, 2018, 1:33 AM), https://www.wsj.com/articles/cia-intercepts-underpin-assessment-saudi-crown-prince-targeted-khashoggi-1543640460; *see also* Julian E. Barnes & Eric Schmitt, *Intercepts Solidify C.I.A. Assessment That Saudi Prince Ordered Khashoggi Killing*, N.Y. Times (Dec. 2, 2018), https://www.nytimes.com/2018/12/02/us/politics/crown-prince-mohammed-qahtani-intercepts.html.

[27]  Mark Mazzetti, *Year Before Killing, Saudi Prince Told Aide He Would Use "a Bullet" on Jamal Khashoggi*, N.Y. Times (Feb. 7, 2019), https://www.nytimes.com/2019/02/07/us/politics/khashoggi-mohammed-bin-salman.html.

These same intercepted communications helped the CIA conclude, after the fact, that the Crown Prince had likely ordered Mr. Khashoggi's execution.[28]  The intelligence agency noted that the communications seemed "to foreshadow the Saudi operation launched against Khashoggi."[29]

### III.   Bipartisan and Global Demand for Investigation and Transparency

As another federal court has recently noted, "[Mr.] Khashoggi's disappearance, and the facts or allegations regarding his killing in Saudi custody, have continued to be a matter of intense interest among the public, legislators, other policymakers, and journalists."  *Open Soc'y Justice Initiative v. CIA*, No. 19-234, 2019 WL 3561889, at *4 (S.D.N.Y. Aug. 8, 2019) (opinion and order denying motion to reduce FOIA response rate).  Numerous U.S. officials, foreign governments, and international human rights groups not only condemned the killing but also called for an immediate investigation and increased transparency.

Among those expressing concern were both Republican and Democratic U.S. Senators:

- Senator Bob Corker, Republican of Tennessee, then chair of the Foreign Relations Committee, said: "I think a price needs to be paid …. I, along with others in the Senate, requested the administration conduct a thorough Global Magnitsky sanctions determination regarding the murder of Jamal Khashoggi."[30]

---

[28]   Warren B. Strobel, *CIA Intercepts Underpin Assessment Saudi Crown Prince Targeted Khashoggi*, Wall St. J. (Dec. 1, 2018, 1:33 AM), https://www.wsj.com/articles/cia-intercepts-underpin-assessment-saudi-crown-prince-targeted-khashoggi-1543640460.

[29]   *Id.*

[30]   *'A Price Needs to Be Paid': US Senate Bill Targets Saudi Arabia*, Aljazeera (Nov. 16, 2018), https://www.aljazeera.com/news/2018/11/senate-bill-targets-saudi-arabia-khashoggi-murder-yemen-181115190143285.html; Press Release, U.S. Senate Comm. on Foreign

- Senator Ben Sasse, Republican of Nebraska, said: "[T]he disappearance of Saudi journalist Jamal Khashoggi will not be 'swept under the rug,'" and "there should be an 'international investigation' into what happened."[31]

- Senator Cory Booker, Democrat of New Jersey, said: "I'm worried about efforts to cover this up and I'm worried about our administration willing to just go along and get along because of a lot of the financial interests that we might have."[32]

A week after Mr. Khashoggi's death, the Senate Foreign Relations Committee issued a letter to President Trump pursuant to the Global Magnitsky Human Rights Accountability Act (the "Global Magnitsky Act")[33] which required the President to make "a determination on the imposition of sanctions pursuant to the Global Magnitsky Human Rights Accountability Act with respect to any foreign person responsible for such a violation related to Mr. Khashoggi."[34]

---

Relations, Corker Statement on U.S. Sanctions Against Saudi Arabian Officials For Murder of Jamal Khashoggi (Nov. 15, 2018) (on file with author).

[31] Mick Krever, *Republican Senator: Khashoggi Disappearance Won't Be 'Swept Under the Rug'*, CNN (Oct. 17, 2018, 2:42 PM), https://www.cnn.com/2018/10/17/politics/khashoggi-sasse-amanpour/index.html.

[32] Hunter Walker, *Cory Booker Says the U.S. Needs to 'Reexamine' Its 'Entire Relationship' with Saudi Arabia*, Yahoo News! (Oct. 18, 2018), https://www.yahoo.com/news/cory-booker-says-u-s-needs-re-examine-entire-relationship-saudi-arabia-211344667.html.

[33] The Global Magnitksy Act requires the President to determine whether a foreign person is responsible for an extrajudicial killing, torture, or other gross violation of internationally recognized human rights against an individual exercising freedom of expression.

[34] Press Release, U.S. Sen. Comm. on Foreign Relations, Corker, Menendez, Graham, Leahy Letter Triggers Global Magnitsky Investigation Into Disappearance of Jamal Khashoggi (Oct. 10, 2018), https://www.foreign.senate.gov/press/chair/release/corker-menendez-graham-leahy-letter-triggers-global-magnitsky-investigation-into-disappearance-of-jamal-khashoggi.

On October 22, 2018, over fifty congressional representatives sent a letter to then-Director of National Intelligence Daniel Coats, inquiring about what actions were taken relating to Directive 191 and Mr. Khashoggi.  The following week, another group of senators sent an additional letter to Director Coats: "Directive [191] is a clear message to the American people that the U.S. government takes targeted threats seriously and prioritizes the protection of individuals as a matter of national security.  Consequently, questions regarding whether Mr. Khashoggi was notified of known threats to his life have raised serious concerns."[35]

On December 13, 2018, the Senate unanimously passed a resolution that held the Crown Prince personally responsible for the death of Mr. Khashoggi.[36]  In the same session, the Senate also for the first time in its history invoked the War Powers Act, and voted to end U.S. military assistance to Saudi Arabia over Mr. Khashoggi's execution.[37]

In December 2018, CIA director Gina Haspel briefed Senate committees on the matter.[38] Based on public comments, the closed-door briefing plainly affirmed that the Crown Prince had ordered the execution of Mr. Khashoggi.  Immediately afterward, Senator Corker publicly

---

[35]   Letter from Richard Blumenthal et al., U.S. Senators, to Daniel Coats, Dir. of Nat'l Intelligence (Oct. 30, 2018), https://www.blumenthal.senate.gov/imo/media/doc/2018.10.30%20Letter%20to%20DNI%20on%20Duty%20to%20Warn.pdf.

[36]   Julie Hirschfeld Davis & Eric Schmitt, *Senate Votes to End Aid for Yemen Fight Over Khashoggi Killing and Saudis' War Aims*, N.Y. Times (Dec. 13, 2018), https://www.nytimes.com/2018/12/13/us/politics/yemen-saudi-war-pompeo-mattis.html.

[37]   *Id.*

[38]   Olivia Gazis, Bo Erickson, Camilo Montoya-Galvez, *Lindsey Graham After CIA Briefing on Jamal Khashoggi Murder: "There's a Smoking Saw,"* CBS News (Dec. 4, 2018, 12:19 PM), https://www.cbsnews.com/news/khashoggi-murder-cia-director-gina-haspel-briefs-senators-on-killing-today-live-updates/.

informed reporters that "[i]f the crown prince went in front of a jury, he would be convicted [of murder] in 30 minutes."[39]  Senator Lindsay Graham added that "[t]here's not a smoking gun—there's a smoking saw."[40]

Congress has continued to urge additional investigation and transparency.  Earlier this year, several U.S. Senators reintroduced legislation requiring a public report on the killing of Mr. Khashoggi.  Senator Martin Heinrich, Democrat of New Mexico and one of the sponsors of the bill, stated that "[t]he American people deserve nothing less than the truth and transparency about the Saudi government's involvement in this shameful act.  That starts with ensuring the public hears directly from the intelligence community identifying who carried out or ordered Mr. Khashoggi's death."[41]  In July 2019, Senator Marco Rubio, Republican of Florida, joined Foreign Relations Committee Chairman Jim Risch, Republican of Idaho, to introduce the Saudi Arabia Diplomatic Review Act of 2019, a bill to mandate an Executive Branch review of America's relationship with the Saudi government.[42]

International bodies and foreign leaders have echoed the widespread demand for transparency and action. On October 25, 2018, the European Parliament adopted, in a single

---

[39]  *Id.*

[40]  *Id.*

[41]  Press Release, Senators Coons, Wyden, Heinrich, Reed, Harris Reintroduce Bill Requiring Public Report on Khashoggi Murder by Saudi Arabia (Feb. 26, 2019), https://www.coons.senate.gov/news/press-releases/senators-coons-wyden-heinrich-reed-harris-reintroduce-bill-requiring-public-report-on-khashoggi-murder-by-saudi-arabia.

[42]  Press Release, Rubio Joins Risch, Shaheen, Coons on New Bill to Review U.S.-Saudi Relations (Jul. 10, 2019), https://www.rubio.senate.gov/public/index.cfm/press-releases?ContentRecord_id=D957B587-1384-424F-A955-ED0F0E50BC60.

reading, by 325 votes to 1, with 19 abstentions, the "Resolution on the Killing of Journalist Jamal Khashoggi in the Saudi Consulate in Istanbul."[43]  The text adopted by the Parliament emphasized, "the need for a continued thorough, credible and transparent investigation, in order to shed proper light on the circumstances of the murder of Jamal Khashoggi and to ensure that all those bearing responsibility are held fully to account."[44]

The United Nations launched an urgent six-month investigation into Mr. Khashoggi's death. The United Nations Special Rapporteur, Agnes Callamard, determined that Mr. Khashoggi's "killing represent[ed] no less than six violations" of international human rights law.[45] Her office also appealed to the UN Human Rights Council, the UN Security Council, and the UN Secretary-General for an "international criminal investigation."[46]

Despite the global and bipartisan call for investigation and transparency, the U.S. government has remained largely unresponsive.  The tone has been set at the top.  In a June 23, 2019 interview, President Donald Trump dismissed both calls for further investigations and calls to hold the Saudi regime accountable.  He stated that the murder had already been "heavily investigated," and said pointedly that the U.S. would favor continued arms sales to the Saudi

---

[43]   Resolution on the Killing of Journalist Jamal Khashoggi in the Saudi Consulate in Istanbul, EUR. PARL. DOC. B8-0500/2018.

[44]   *Id*.

[45]   *Khashoggi Murder 'an International Crime', Says UN-Appointed Rights Investigator: Special In-Depth UN News Interview*, UN News (June 20, 2019), https://news.un.org/en/story/2019/06/1040951.

[46]   *Id*.

government over additional investigation.[47]  Saudi Arabia, he noted, continues to buy "massive amounts, $150 billion worth of military equipment . . . . So Saudi Arabia is a big buyer of America product.  That means something to me.  It's a big producer of jobs."[48]  The president argued that to give priority to human rights in those circumstances would make him a "fool."

After meeting with Saudi King Salman, Secretary of State Mike Pompeo told reporters that he simply did not "want to talk about any of the facts," and "[the Saudi government] didn't want to either."[49] In the latest turn of events, it was reported just today that the Crown Prince has now reportedly claimed "all the responsibility" for the killing of Khashoggi, while still denying that he had prior knowledge of the plot.[50]

## IV. CPJ's Narrow FOIA Requests and the Government's *Glomar* Responses

On October 19, 2018, CPJ sent FOIA requests to the CIA, FBI, NSA, and ODNI seeking records related to the Government's duty to warn and any records in relation to the duty to warn as it relates to Mr. Khashoggi.  CPJ did not ask the Government to disclose any intelligence activities, sources, or methods;  rather the requests sought only the following:

---

[47]   Chuck Todd, *President Trump's Full, Unedited Interview with Meet the Press*, NBC News (June 23, 2019), https://www.nbcnews.com/politics/meet-the-press/president-trump-s-full-unedited-interview-meet-press-n1020731.

[48]   *Id*.

[49]   Megan Keller, Pompeo: Saudis Didn't Want to Discuss 'Any of the Facts' in Khashoggi Disappearance, The Hill (Oct. 17, 2018, 12:06 PM), https://thehill.com/homenews/administration/411848-pompeo-saudi-arabia-didnt-want-to-discuss-any-of-the-facts-in.

[50] Ben Hubbard, *Saudi Prince Accepts Responsibility for Khashoggi Killing, but Denies Involvement*, N.Y. Times (Sept. 26, 2019, 6:16 AM), https://www.nytimes.com/2019/09/26/world/middleeast/mbs-khashoggi-killing-responsibility.html?

Request 1:  Procedures or guidance for determining whether to warn, or for delivering a warning to, an intended victim or those responsible for protecting the intended victim, pursuant to Directive 191.[51]

Request 2:  Records concerning the duty to warn under Directive 191 as it relates to Jamal Khashoggi, including any records relating to duty to warn actions taken with respect to him.

Request 3:  Records concerning any issue arising among IC elements regarding a determination to warn Khashoggi or waive the duty to warn requirement, or regarding the method for communicating threat information to him.

Request 4 (for ODNI only):  Records relating to any dispute referred to the ODNI regarding a determination to warn Khashoggi or waive the duty to warn requirement, or regarding the method for communicating threat information to him.[52]

On November 20, 2018, after the Defendants failed to respond to the Knight Institute's FOIA requests within the statutorily mandated time period, the Knight Institute initiated this lawsuit to compel the Defendants to produce responsive documents.  CPJ joined as a plaintiff on January 17, 2019.  Dkt. No. 17.

Defendants eventually responded as follows:[53]

**ODNI**: On February 14, 2019, ODNI informed the Plaintiffs that it had conducted and completed a search as to Request 1, and had located responsive records, all of which had originated with other Defendant agencies.  Decl. of Patricia Gaviria ("Gaviria Decl.") ¶ 11.

---

[51]   None of the Defendants issued *Glomar* responses to Request 1.

[52]   The Knight First Amendment Institute  at Columbia University made parallel FOIA requests prior to CPJ on October 19, 2018. First Amended Complaint ("FAC"), Dkt. No. 17, ¶¶ 15, 17; Exhibit A to First Amended Complaint, Dkt. No. 17-1 (the Knight Institute's October 19, 2018 requests).

[53]   The Knight Institute voluntarily dismissed its claims on July 19, 2019.  The court granted CPJ's motion to dismiss claims against the Department of State as defendant on July 30, 2019.

ODNI informed the Knight Institute and CPJ that these records had been referred to the respective other agencies for processing and production, because all responsive records originated with other Defendant agencies.  *Id.*

ODNI also informed the Plaintiffs that, pursuant to FOIA Exemptions 1 and 3, it could neither confirm nor deny the existence of records responsive to Requests 2, 3, or 4.  *Id.*  at ¶ 12. ODNI explained that the fact of the existence or nonexistence of such records "is itself currently and properly classified, and could reveal intelligence sources and methods information that is protected from disclosure pursuant to Section 102A(i)(1) of the National Security Act of 1947[.]" *Id.* at Ex. C.

**NSA:** On March 11, 2019, the NSA informed the Plaintiffs that it had completed a search as to Request 1, and had located two responsive records, totaling 21 pages, which it simultaneously produced.  Decl. of Linda M. Kiyosaki ("Kiyosaki Decl.") ¶ 13.  The NSA claimed that, under FOIA Exemptions 1 and 3, it could neither confirm nor deny the existence of records responsive to Requests 2 or 3.  *Id.*  The NSA stated that the fact of the existence or nonexistence of such records "is a currently and properly classified matter," and that "the existence or non-existence of the information" is protected from disclosure by 18 U.S.C. § 798, 50 U.S.C. §§ 3024(i), 3605.  *Id.* at Ex. B.

**CIA:** On March 15, 2019, the CIA informed the Plaintiffs that it had conducted and completed a search as to Request 1, and had located responsive records.  Decl. of Antoinette B. Shiner ("Shiner Decl.") ¶ 13 & fn. 3.  For Request 1, the CIA produced three records with redactions, totaling 19 pages, and withheld in full two additional records.  *Id.*  The CIA claimed

the redactions were pursuant to FOIA Exemption 1 and 3, and that it withheld two documents in full under FOIA Exemptions 1, 3, 5, and 6. Shiner Decl. ¶ 13 & Ex. C.

The CIA also claimed that, pursuant to FOIA Exemptions 1 and 3, it could neither confirm nor deny the existence of records responsive to Requests 2 or 3. *Id.* The CIA explained that the fact of the existence or nonexistence of such records "is itself currently and properly classified and relates to CIA intelligence sources and methods information that is protected from disclosure by Section 6 of the CIA Act of 1949, 50 U.S.C. § 3507, and Section 102A(i)(1) of the National Security Act of 1947, 50 U.S.C. § 3024(i)(1)." *Id.*

**FBI:** On March 29, 2019, the FBI informed the Plaintiffs that it had conducted and completed a search as to Request 1, and had located eight responsive records, totaling 33 pages, which it simultaneously produced, in part. With respect to Requests 2 or 3, the FBI informed the Plaintiffs it could neither confirm nor deny the existence of such records. Decl. of David M. Hardy ("Hardy Decl.") ¶ 18. The Defendant claimed that "the mere acknowledgement of such records' existence or nonexistence would in and of itself trigger harm to national security interests per Exemption (b)(1) and/or reveal intelligence sources and methods per Exemption (b)(3); 50 U.S.C. § 3024(i)(1)." *Id.* (citing Ex. C). On May 14, 2019, the FBI released a single additional page pursuant to its March 29, 2019 production. *Id.* at ¶ 19 (citing Ex. D).

The Defendants moved for summary judgment on August 28, 2019. CPJ hereby opposes that motion and seeks summary judgment in its favor on the Defendants' *Glomar* responses.[54]

---

[54] CPJ will not challenge the CIA's redactions and withholdings.

## ARGUMENT

Allowing the Government's *Glomar* responses to stand would be to subvert the purpose

of FOIA—that is, "to pierce the veil of administrative secrecy and to open agency action to the

light of public scrutiny." *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976) (citation and

quotation omitted). *See also Am. Ctr. for Law & Justice v. U.S. Dep't of State*, 354 F. Supp. 3d 1,

6 (D.D.C. 2018) (FOIA mandates a "strong presumption in favor of disclosure."); *CIA v. Sims*,

471 U.S. 159, 165 (1985) (FOIA "calls for broad disclosure of Government records.").  Contrary

to Defendants' expansive interpretation of Exemptions 1 and 3, courts "have consistently stated

that FOIA exemptions are to be ***narrowly*** construed." *U.S. Dep't of Justice v. Julian*, 486 U.S. 1,

8 (1988) (emphasis added); *see also, Dep't of Air Force v. Rose*, 425 U.S. at 361 (internal

citations omitted) ("Nothing in FOIA 'should be read to authorize withholding of information or

limit the availability of records to the public, except as specifically stated.'").  "[The] limited

exemptions [in FOIA] do not obscure the basic policy that disclosure, not secrecy, is the

dominant objective of the Act." *Dep't of Air Force v. Rose*, 425 U.S. at 361.

This Court should deny the Defendants' summary judgment motion, and instead grant

summary judgment in favor of CPJ for two independently sufficient reasons.

The Department of State's public denial of any prior knowledge by the *entire* U.S.

government of the threat to Mr. Khashoggi's life is fatal to the Government's *Glomar* responses.

*See Electronic Frontier Foundation v. U.S. Dep't of Justice*, 384 F.Supp.3d 1, 9 (D.D.C. 2019)

(citing James Madison Project v. *U.S. Dep't of Justice*, 302 F. Supp. 3d 12, 20 (D.D.C. 2018))

("A requester may challenge a Glomar response either by arguing that 'the agency has previously

official[ly] acknowledged the fact of the existence of a requested record' or by arguing that disclosure would not cause any harm under the FOIA exemption invoked.").

The Government has not carried its burden to show that acknowledging the existence or nonexistence of records would cause harm cognizable under FOIA Exemptions 1 or 3,  5 U.S.C. § 552 §§ (b)(1), (3).  *See Bartko v. U.S. Dep't of Justice*, 898 F.3d 51, 63 (D.C. Cir. 2018) (citation omitted) (requiring a showing of "harm cognizable under an FOIA exception."); *see also Smith v. CIA*, 246 F. Supp. 3d 28, 31 (D.D.C. 2017) ("[T]he burden is on the government agency to show that nondisclosed, requested material falls within a stated exemption."); 5 U.S.C. § 552(a)(4)(B) ("the burden is on the agency to sustain its action [of withholding a record under a stated exemption]"); *Elec. Frontier Found. v. Dep't of Justice*, 384 F. Supp. 3d 1, 9 (D.D.C. 2019) ("It is well established that 'the vast majority of FOIA cases can be resolved on summary judgment.'") (citing *Brayton v. Office of the U.S. Trade Representative*, 641 F.3d 521, 527 (D.C. Cir. 2011)).  The Government's boilerplate declarations simply do not sufficiently explain why the existence or nonexistence of the requested records is a fact that is exempt from disclosure under any FOIA exemption.  Courts review the Government's responses to FOIA requests *de novo* (5 U.S.C. § 552 (a)(4)(B); *Am. Ctr. for Law*, 354 F. Supp. 3d at 7), and careful review is especially warranted here given the widely recognized importance of this matter.

## I.    Summary Judgment for CPJ Is in Order, Given the Government's Public Statements Outside This Litigation

### A.    The Government Has Publicly Denied Prior Knowledge Regarding the Threat to Mr. Khashoggi

The Department of State's public statement that "[t]he United States had no advanced knowledge of Jamal Khashoggi's disappearance,"  Press Briefing, U.S. Dep't of State,

Department Press Briefing with Robert Palladino (Oct. 10, 2018),

https://www.state.gov/briefings/department-press-briefing-october-10-2018/ (last visited Sep. 15,

2019), constitutes an official acknowledgment by the Government that records responsive to

CPJ's FOIA requests not exist, and thereby waives the Government's ability to invoke

*Glomar*. *See Wolf v. CIA*, 473 F.3d 370, 378 (D.C. Cir. 2012) (finding that agencies are not

entitled to assert a *Glomar* response if the government has already officially acknowledged the

existence of the requested records); *ACLU v. CIA*, 710 F.3d 422, 427 (D.C. Cir. 2013) ("[T]he

plaintiff can overcome a *Glomar* response by showing that the agency has already disclosed the

fact of the existence (or nonexistence) of responsive records, since that is the purportedly exempt

information that a *Glomar* response is designed to protect.").

The Department of State's public disclosure encompasses the duty to warn, because it

necessarily addresses the Government's knowledge or lack thereof regarding Mr. Khashoggi's

disappearance. *See Fitzgibbon v. CIA*, 911 F.2d 755, 765 (D.C. Cir. 1990) (requiring "the

information requested must be as specific as the information previously released" to defeat a

*Glomar* invocation). Stated differently, if the Government indeed had no advance knowledge of

Mr. Khashoggi's disappearance, then it necessarily could not have documents concerning any

decision to warn or not warn Mr. Khashoggi.

Notably, the Department of State spoke on behalf of "the United States" – that is, on

behalf of all agencies and not just itself. This defeats any argument the Government might

advance on reply that the admission must come from a defendant agency.

The significance of the Department of State's denial can hardly be overstated. In light of

that denial, one of two things must be true. <u>First</u>, if the denial is true, then the defendant

agencies here logically could have no documents related to the duty to warn – and they logically must be free to say so, since that would add nothing of substance to the Department of State's denial.  Second, if the denial is inaccurate, then the Government has (whether deliberately or inadvertently) deceived the American people.  In that scenario, there surely must be documents relevant under Directive 191, and the *Glomar* responses offered in this case are part and parcel of a troubling deception.  Regardless of which scenario holds true, the case for this Court to require greater transparency from Defendants is compelling.

**B.  The Government Has Publicly Acknowledged That It Has Documents Related To The Murder**

In separate litigation, both the CIA and the ODNI have acknowledged that they have "records relating to the killing of U.S. resident Jamal Khashoggi, including but not limited to the CIA's findings on and/or assessment of the circumstances under which he was killed and/or the identities of those responsible," *Open Soc'y Justice Initiative v. CIA*, No.  1:19-cv-00234-PAE, ECF No. 1. (S.D.N.Y. Jan.  9,  2019).  *See  id.* at ECF No. 99 "Joint Status Letter" (Sept. 24, 2019). The CIA and the ODNI do not contend here, nor could they, that the national interest has been harmed by acknowledging the existence of these records in the New York litigation.  Their statements in that case waive the ability to rely on *Glomar* responses here as to CPJ.  To the extent that the CIA and ODNI might try to distinguish the records whose existence it has admitted from records related to the duty to warn, any such distinction is surely too fine to withstand this Court's scrutiny.  Particularly given the compelling public interest in this matter, the *Glomar* responses here must be seen as legally inadequate.

24

II.    **The Government Has Failed To Show Cognizable Harm Under Either Claimed FOIA Exemption Because CPJ's Requests Do Not Require Disclosure Of Intelligence Activities, Sources, Or Methods.**

Defendants' arguments that to acknowledge the mere ***existence or nonexistence of records*** would necessarily reveal particular ***intelligence activities, sources, and methods*** is a shopworn tactic in FOIA litigation over intelligence matters.  It is unavailing in the specific circumstances of this case.

A.    **The Subject of CPJ's FOIA Requests Is Not "Properly Classified" and Therefore Not Exempt from Disclosure Under Exemption 1.**

Exemption 1 protects records that are specifically authorized by an Executive Order to be kept secret in the interest of national defense or foreign policy and are in fact properly classified pursuant to such Executive Order.  5 U.S.C. § 552(b)(1).  The agencies claim that the existence or nonexistence of records responsive to CPJ requests, namely, information concerning the duty to warn Mr. Khashoggi is exempt from disclosure under Executive Order No. 13526, which protects classified national security information.  Exec. Order No. 13526, 75 Fed. Reg. 707 (Dec. 29, 2009) (*hereinafter* the "Order").  In order for information to be properly classified under the Order, the information must, *inter alia*, "fall[] within one of the protected categories listed in section 1.4 of this order; *and* . . .  the unauthorized disclosure of the requested information reasonably could be expected to result in damage to the national security. . . ."  *See* Section 1.1 Exec. Order No. 13526 § 1.1(a) (emphasis added).  Finally, the requested information must also be classified as "top secret, secret, or confidential" in accordance with Section 1.2 of the Order.

Defendants do not sufficiently satisfy their burden because they do not prove that the disclosure of information sought (1) would reveal intelligence activities, sources, or methods and

(2) could reasonably result in damage to national security.  *Cf. Larson v. U.S. Dep't of State*, 565

F.3d 857, 862 (D.C. Cir. 2009) (courts may only grant summary judgment on the basis of an

affidavit if it contains "reasonably specific detail to demonstrate that the information withheld

logically falls within the claimed exemption").  Therefore, Defendants' *Glomar* responses are not

justified.

> **1.    Defendants Have Failed To Show That Acknowledging The Existence Or Nonexistence Of Documents Concerning The Directive 191 Duty To Warn As It Relates To Mr. Khashoggi Would Reveal Intelligence Activities, Sources, Or Methods.**

Defendants have not explained, and cannot explain, why merely acknowledging the

existence or nonexistence of documents would tend to reveal specific targets of surveillance or

sources in this particular case.  To the extent that the documents requested would in fact reveal

such details, Defendants also have shown no reason why they would not be able to simply redact

that information instead of categorically refusing to acknowledge or deny the existence of the

documents themselves.

Moreover, acknowledging the existence of responsive records would not necessarily

reveal intelligence activities, sources, or methods to any degree greater than what is already

widely known.  As noted above, both the CIA and the ODNI have publicly acknowledged the

possession of relevant records.  Surely the Defendants can be at least as forthcoming here

without doing damage to national security.  FOIA and the strong public interest at stake in this

case demand that they do so.

Common sense suggests that the Government is not necessarily concerned with

protecting particular sources and methods, but also – or instead – with avoiding disclosure of the

extent of U.S. surveillance of allies.  The fact that the U.S. spies on friendly nations is already widely known, however, and does not merit *Glomar* protection.  Christopher Murphy, *Why Would the U.S. Spy on Its Allies?  Because Everyone Does*, CNN (Jun. 25, 2015), https://www.cnn.com/2015/06/25/opinions/france-spy-claims/index.html.

Nor is the fact that the U.S. specifically collected information about Mr. Khashoggi a secret.  First, *The Washington Post* has reported that information about Mr. Khashoggi was "disseminated throughout the U.S. Government" and "routinely available to people working on U.S. policy toward Saudi Arabia or related issues."  Philip Bump, *What We Know about What the Government Knows about Jamal Khashoggi's Disappearance*, Wash. Post (Oct. 17, 2018), https://beta.washingtonpost.com/politics/2018/10/17/what-we-know-about-what-government-knows-about-jamal-khashoggis-disappearance/.

Second, reputable news sources repeatedly have noted that U.S. intelligence intercepted communications of Saudi officials discussing a plan to capture Mr. Khashoggi.  Loveday Morris, et al., *Saudis Are Said to Have Lain in Wait for Jamal Khashoggi*, Wash. Post (Oct. 9, 2019), https://www.washingtonpost.com/world/saudis-lay-in-wait-for-jamal-khashoggi-and-left-turkey-quickly-sources-say/2018/10/09/0e283e2e-cbc5-11e8-ad0a-0e01efba3cc1_story.html.  For example, as indicated above, at least one year before Mr. Khashoggi's murder, U.S. intelligence agencies intercepted communications regarding the Crown Prince and one of his aides relaying deadly threats to Mr. Khashoggi.  Mark Mazzetti, *Year Before Killing, Saudi Prince Told Aide He Would Use 'a Bullet' on Khashoggi*, N.Y. Times (Feb. 7, 2019), https://www.nytimes.com/2019/02/07/us/politics/khashoggi-mohammed-bin-salman.html.  In addition, leading up to and following Mr. Khashoggi's murder, the CIA identified messages from

the Crown Prince regarding plans to harm Mr. Khashoggi.  Warren B. Strobel, *CIA Intercepts Underpin Assessment Saudi Crown Prince Targeted Khashoggi*, Wall St. J. (Dec. 1, 2018), https://www.wsj.com/articles/cia-intercepts-underpin-assessment-saudi-crown-prince-targeted-khashoggi-1543640460.  Since Mr. Khashoggi's assassination, the CIA has warned multiple people that their pro-democracy work efforts has made them targets of potential retaliation from Saudi Arabia.  Josh Meyer, *The CIA Sent Warnings to at Least 3 Khashoggi Associates About New Threats From Saudi Arabia*, TIME (May 9, 2019), https://time.com/5585281/cia-warned-jamal-khashoggi-associates/.  Additionally, former NSA analyst John Schindler has publicly stated: "I can confirm that the National Security Agency, America's big ear, indeed intercepted Saudi communications that indicated Riyadh had something unpleasant in store for Mr. Khashoggi.  ***Listening in on foreign governments, after all, is NSA's main job***, and that includes frenemies like Saudi Arabia as well as hostile regimes."  John Schindler, NSA:  *White House Knew Jamal Khashoggi Was In Danger. Why Didn't They Protect Him?*, Observer (Oct. 10, 2019), https://observer.com/2018/10/nsa-source-white-house-knew-jamal-khashoggi-danger/ (emphasis added).  This information is clearly not classified despite the fact that it recognizes that Government agencies, including the CIA and NSA, routinely collect intelligence information, have collected information concerning Mr. Khashoggi, and intercepted relevant Saudi communications.

There is likewise no merit to the Government's argument that acknowledging the nonexistence of records would reveal an agency's "blind spot" or indicate a "dearth of underlying information."  *See* Shiner Decl. ¶ 44; Kiyosaki Decl. ¶ 19.  As noted above, the Department of State has already publicly denied any prior knowledge of the plan to kill Mr.

Khashoggi.  That statement alone makes clear that a denial of prior knowledge can be made on the public record without revealing any underlying details regarding intelligence sources or methods.

### 2.   None Of The Agency Declarations Establish The Requisite Reasonable Expectation Of "Identifiable or Describable Damage to National Security"

The Government also has failed to show that acknowledgement of the existence or nonexistence of these documents "could reasonably be expected to cause identifiable or describable damage to national security" as required by Section 1.4(c) of the Order.  Exec. Order No. 13526 § 1.4.  Though deference is afforded to agencies in matters concerning national security exemptions, "deference is not equivalent to acquiescence."  *Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 30 (D.C. Cir. 1998) (internal citation omitted).  The D.C. Circuit has cautioned that courts should not "stretch th[e] [*Glomar*] doctrine too far" and "give their imprimatur to a fiction of deniability that no reasonable person would regard as plausible."  *Elec. Frontier Found.* (citing *ACLU v. CIA*, 710 F.3d 422, 431 (D.C. Cir. 2013)).  Consideration point by point of each defendant agency's declaration confirms that intelligence sources and methods would not, in fact, have to be compromised by a non-*Glomar* response:

### (a)   ODNI Declaration

Acknowledging the existence or nonexistence of responsive documents would not necessarily disclose detailed information that *particular* individuals were surveilled prior to Mr. Khashoggi's murder to a degree greater that what is already publically known, as ODNI contends in its declaration,  Gaviria Decl. ¶ 21.   As mentioned previously, there are credible

public news outlets that have reported that the Government had information concerning threats to Mr. Khashoggi.  Therefore, ODNI has failed to show how agency acknowledgement of responsive documents would result in identifiable harm to national security.

### (b)    NSA Declaration

The fact that the NSA uses signals intelligence ("SIGINT") and communications intelligence ("COMINT") is public information.  Kiyosaki Decl. ¶¶ 6, 8.  The NSA has not shown why acknowledging documents relevant to the duty to warn in this case would *necessarily* provide critical information about the IC's capabilities other than the public fact that it uses SIGINT and COMINT.  Therefore, the NSA's conclusory statement of harm is insufficient.

### (c)    CIA Declaration

The CIA has not shown why "revealing aspects of what types of information or threats the Agency deems sufficient to qualify as 'credible and specific,' so as to trigger the duty to warn; internal processes related to how the Agency conducts the appropriate analysis of this question; and how warnings are, in certain instances, conveyed to the intended victim, would disclose details about the practice of intelligence gathering and specific aspects of Agency tradecraft."  Shiner Decl. ¶ 21.

The CIA report on Mr. Khashoggi's killing already exists.  In December 2018, U.S. Senators received a briefing on the matter from CIA Director Gina Haspel.  Patricia Zengerale, *Top Senators Briefed by CIA Blame Saudi Prince for Khashoggi Death*, Reuters (Dec. 4, 2018), https://www.reuters.com/article/us-saudi-khashoggi-cia/top-senators-briefed-by-cia-blame-saudi-prince-for-khashoggi-death-idUSKBN1O32BR.  The public is already aware of the fact that the CIA had enough information about Mr. Khashoggi to have a briefing that would lead senators to

state, "You have to be willfully blind not to come to the conclusion that this was orchestrated and organized by people under the command of MbS." *Id.* Therefore, mere acknowledgement of records pertaining to parts 2 and 3 of Plaintiff's request would not disclose details of the CIA's intelligence gathering and is unlikely to cause damage or harm to national security.

### (d)   FBI Declaration

CPJ's requests do not require disclosure or discovery of intelligence activities, sources, or method as the FBI contends in its declaration, Hardy Decl. ¶¶32-33. The FBI may acknowledge the existence or nonexistence of responsive documents without specifying details of properly classified information.  To the extent that the requested information involves matters that are protected by Executive Order 13526, that information can be redacted or withheld to shield matters of national security.[55]  Regarding the FBI's proposition that indirect references to intelligence matters may have adverse effects on the Government, the Government has already made public references to intelligence information concerning Mr. Khashoggi.  The FBI has not identified any harm that would result in acknowledgement of the existence or nonexistence of relevant records.

### B.   Exemption 3 Does Not Justify the Government's *Glomar* Responses.

Exemption 3 provides that FOIA "does not apply to matters that are . . . specifically exempted from disclosure by statute" if the statute "(i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or (ii) establishes particular

---

[55]   CPJ does not concede its ability to challenge any withheld or redacted documents that are acknowledged as a result of this litigation.

criteria for withholding or refers to particular types of matters to be withheld."  5 U.S.C.

§ 552(b)(3).

In determining whether Exemption 3 properly applies, "courts ask: (1) whether the statute

in question is a statute of exemption; and if so, (2) whether the information at issue satisfies the

criteria in the statute." *Judicial Watch, Inc. v. U.S. Dep't of State*, 373 F. Supp. 3d 142, 147

(D.C. Cir. 2019) (citing *CIA v. Sims*, 471 U.S. 159, 167 (1985)).

The defendant agencies have all argued that the acknowledgement of the existence or

nonexistence of responsive records is itself protected disclosure under the National Security Act

§ 102A(i)(1).  Additionally, the NSA has invoked Section 6 of the NSA Act and 18 U.S.C. § 798

in an attempt to justify the lack of confirmation or denial as to the existence or nonexistence of

responsive records.  While all of these statutes have been found to constitute "statutes of

exemption" for the purposes of Exemption 3, the agencies here have failed to provide

"reasonably specific detail" to adequately demonstrate that the information at issue satisfies the

criteria set forth in these statutes.  *See Elec. Frontier Found. v. Dep't of Justice*, 384 F. Supp. 3d

1, 9 (D.D.C. 2019); *See also, Founding Church of Scientology v. NSA*, 610 F.2d 824, 830 (D.C.

Cir. 1979) (quoting *Vaughn v. Rosen*, 484 F.2d 820, 826 (D.C. Cir. 1973)) ("'[C]onclusory and

generalized allegations of exemptions' are unacceptable;  if the court is unable to sustain

nondivulgence on the basis of affidavits, [i]n camera inspection may well be in order.");  *Larson

v. Dep't of State*, 565 F.3d 857, 864 (D.C. Cir. 2009) ("If an agency's statements supporting

exemption contain reasonable specificity of detail as to demonstrate that the withheld

information logically falls within the claimed exemption and evidence in the record does not

suggest otherwise . . . the court should not conduct a more detailed inquiry to test the agency's

judgment and expertise or to evaluate whether the court agrees with the agency's opinions."). Here, the agencies' statements do not provide reasonable specificity of detail as to demonstrate why exemption 3 applies; as such, Defendants' *Glomar* responses are not justified.

> 1.    **The Government Has Not Shown That Section 102A(I)(1) Of The National Security Act  Provides A Basis For Failing To Acknowledge The Existence Or Nonexistence Of Responsive Records.**

Acknowledging records responsive to the narrow requests related to the Government's duty to warn as it relates to the death of Mr. Khashoggi would not, as the agencies suggest, implicate "intelligence sources and methods."  The National Security Act provides, in relevant part, that "[t]he Director of National Intelligence shall protect intelligence sources and methods from unauthorized disclosure."  50 U.S.C. § 3024(i)(1).  Each agency has asserted that even so much as the acknowledgement of the existence or nonexistence of records responsive to Parts 2 and 3 (and for ODNI, Part 4) "would run afoul of Section 102A(i)(1) by tending to reveal exactly such information."  Defs.' Mem. Supp. Mot. Summ. J., 28.

The National Security Act does not wholly exempt these agencies from FOIA requests by virtue of the fact that they all engage in work that is somehow related to "intelligence sources and methods information."  Rather, FOIA Exemption 3 requires that the Agencies "demonstrate[] that an answer to the query 'can reasonably be expected to lead to unauthorized disclosure of intelligence sources and methods.'"  *Gardels v. CIA*, 689 F.2d 1100, 1103 (D.C. Cir. 1982) (quoting *Halperin v. CIA*, 629 F.2d 144, 147 (D.C. Cir. 1980)).  Parts 2-4 of CPJ's requests do not ask that the agencies provide any information on intelligence sources or methods information.  Rather, CPJ's requests pertain solely to records specifically related to a potential duty to warn with relation to Mr. Khashoggi.  Merely acknowledging the existence or

nonexistence of such documentation and providing it, if it does exist, would not require the

Agencies to provide any information on the sources from which they obtain information or on

the methods by which they obtain information.  The agencies may, if it is justified, apply

redactions to certain portions of any responsive records should certain portions provide more

specific information on intelligence sources and methods.  The agencies have not demonstrated,

however, how merely acknowledging the existence (or lack thereof) of responsive records would

result in the unauthorized disclosure of intelligence sources and methods.  Therefore, the

agencies' *Glomar* responses may not be justified on the basis of the National Security Act.

<div style="margin-left:2em;">

(a)    **The ODNI Has Failed To Explain How Disclosing The Mere Existence Or Nonexistence Of Responsive Records Would Result In The Unauthorized Disclosure Of "Intelligence Sources And Information."**

</div>

The ODNI incorrectly argues that "[d]isclosing whether or not the ODNI maintains

records responsive to parts 2-4 of plaintiff's FOIA request would reveal the existence or non-

existence of IC intelligence sources and methods information" because "[t]he information

withheld . . . constitutes intelligence sources and information."  Gaviria Decl., ¶ 29.  ODNI's

declarant provides no additional explanation as to how exactly providing records concerning the

duty to warn as it specifically relates to Jamal Khashoggi would provide any information on the

types of intelligence sources and methods that Section 102A(i)(1) of the National Security Act is

meant to protect.  While the requested information may or may not exist as a result of the

existence or nonexistence of intelligence sources and methods information, the ODNI has not

shown how acknowledging the existence or nonexistence of such documents would in fact reveal

anything about those intelligence sources and methods information.  Therefore, the ODNI may

not invoke the National Security Act § 102A(i)(1) does not support ODNI's reliance on Exemption 3.

>**(b)** **The NSA Has Failed To Explain How Disclosing The Mere Existence Or Nonexistence Of Responsive Records Would Result In The Unauthorized Disclosure Of "Intelligence Sources And Methods".**

The NSA does not explain how confirming or denying the existence of responsive records necessitates the revelation of "underlying intelligence information relating to a threat to a particular individual" thereby disclosing "information about IC intelligence sources and methods."  Kiyosaki Decl., ¶ 27. It does not necessarily follow that specific sources and methods would be implicated by the revelation of information that could have come (or not come) from any number of sources.  Therefore, the NSA may not invoke the National Security Act § 102A(i)(1) as support for its reliance on Exemption 3.

>**(c)** **The CIA Has Failed to Explain How Disclosing the Mere Existence or Nonexistence of Responsive Records Would Result in the Unauthorized Disclosure of "Intelligence Sources and Methods".**

While the CIA contends that the information sought would "concern[] intelligence sources and methods," Shiner Decl. ¶ 46, the declaration does not in fact explain how acknowledging the existence or nonexistence of the information would reveal those intelligence sources and methods.  Therefore, the CIA may not invoke the National Security Act § 102A(i)(1) as support for its reliance on Exemption 3.

35

        **(d)**      **The FBI Has Failed to Explain How Disclosing the Mere Existence or Nonexistence of Responsive Records Would Result in the Unauthorized Disclosure of "Intelligence Sources and Information".**

While the FBI asserts that "acknowledging the existence or non-existence of records responsive to Plaintiff's request could reasonably be expected to reveal classified national security information" and "would pertain to 'intelligence sources and methods'", Hardy Decl. ¶ 43,the declaration does not explain how acknowledgement would *reveal* those intelligence sources and methods.  The FBI has not correctly invoked the National Security Act § 102A(i)(1) as support for its reliance on Exemption 3.

       **2.**      **Section 6 Of The National Security Agency Act Does Not Provide A Basis For The NSA Failing To Acknowledge The Existence Or Nonexistence Of Responsive Records.**

Section 6 of the NSA Act provides that nothing in any law "shall be construed to require the disclosure of the organization or any function of the National Security Agency, or any information with respect to the activities thereof, or the names, titles, salaries, or number of the persons employed by such agency."  50 U.S.C. § 3605.

The NSA argues that "[d]isclosure of *any* information relating to NSA activities is potentially harmful.  Section 6 states unequivocally that NSA cannot be compelled by statute to disclose any information with respect to its activities."  Kiyosaki Decl., ¶ 28.  While "the legislation's scope must be broad in light of the agency's highly delicate mission," the D.C. Circuit has previously held that in this statute, "a term so elastic as 'activities' should be construed with sensitivity to the hazard(s) that Congress foresaw."  *Founding Church of Scientology*, 610 F.2d at 829 (internal citations omitted).

In this case, the NSA has simply asserted, without more, that "acknowledging the existence or non-existence of responsive records . . . would reveal information about NSA's functions and activities."  Kiyosaki Decl., ¶ 28.  While CPJ has requested information that may or may not be in the NSA's possession, it has not requested information on the NSA's functions or activities.  The fact that the NSA has or does not have responsive records does not provide any actual information on the NSA's functions or activities such that Section 6 would provide protection.  Therefore, the NSA may not rely on Section 6 as support for its reliance on Exemption 3.

### 3.    18 U.S.C. § 798 Does Not Provide A Basis For The NSA Failing To Acknowledge The Existence Or Nonexistence Of Responsive Records.

There is no merit to the NSA's argument that confirming or denying the existence of records responsive to Part 2 of the request "would reveal information related to NSA's [communication intelligence] activities, targets, priorities, and capabilities" because "[t]he duty to warn . . . could only be triggered by the existence of intelligence information—and, with respect to NSA specifically, [communication intelligence]."  Kiyosaki Decl. ¶ 29.

Section 798, in relevant part, makes it illegal to "make[] available to an unauthorized person . . . any classified information . . . concerning the communication intelligence activities of the United States or any foreign government."  18 U.S.C. § 798(a)(3).   "Communication intelligence" is defined within the statute to mean "all procedures and methods used in the interception of communications and the obtaining of information from such communications by other than the intended recipients."  18 U.S.C. § 798(b).  Part 2 requests records concerning the duty to warn as it relates to Mr. Khashoggi, including records related to duty to warn actions

with respect to him.  While there may be intelligence information for the responsive records to exist, the acknowledgement of the existence or nonexistence or responsive records does not provide any actual information on the "communication intelligence activities" protected by 18 U.S.C. § 798.  Therefore, the NSA may not invoke 18 U.S.C. § 798 as support for its reliance on Exemption 3.

**III.    The Public Record Suggests that the Government Is Relying on *Glomar* to Avoid Embarrassment, Which Is Not a Proper Basis for Nondisclosure.**

While "[a]gency affidavits are entitled to a presumption of good faith," that presumption may be "called into question" – as it is here – "by contradictory record evidence or evidence of bad faith." *Elec. Frontier Found.*, 384 F. Supp. 3d at 9 (citing *SafeCard Servs. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir.1991)).  In particular, it is well recognized that the avoidance of embarrassment is not a proper basis for avoiding disclosure under FOIA.  See Executive Order Section 1.7(a)(2) (information may not be classified "to prevent embarrassment to a person, organization, or agency").  Not only is avoidance of embarrassment an express limitation to Defendants' Exemption 1 claim, but there is no sound reason why the Government should be able to rely on avoidance of embarrassment to support the use of Exemption 3.

Here, the public record and the record of this case indicate multiple sources of likely embarrassment that would tend to lead to *Glomar* responses:

- If there are documents that show that specific agencies knew of the threat to Mr. Khashoggi prior to the murder (as reputable investigative reports suggest), but that the agencies failed to consider or execute their obligations under Directive 191, then that of course would be critically embarrassing to the Government.  That scenario could only indicate that the agencies either were negligent in the execution of Directive 191 duties, or that they had

deliberately turned a blind eye to human rights and the rule of law in support of an ally.  *Cf.*
*Elec. Frontier Found.*, 384 F. Supp. 3d at 9 (explaining that a typical presumption of good
faith is called into question by evidence of bad faith).

- Conversely, were such documents ***not*** to exist, that too would indicate a serious failure of
intelligence.  The scale of the murder operation was substantial.  Given (for example) the
number of people involved, the need for electronic communication and the amount of travel,
the Saudi operatives involved surely must have thrown off detectible clues.  The U.S.
government undoubtedly would not want to publicly disclose that the intelligence community
had failed to spot those clues, but avoiding the embarrassment of that disclosure is not a
cognizable interest under FOIA.  *Cf.* Josh Meyer, *The CIA Sent Warnings to at Least 3*
*Khashoggi Associates About New Threats From Saudi Arabia*, TIME (May 9, 2019),
https://time.com/5585281/cia-warned-jamal-khashoggi-associates/.  To the extent that the
Government argues that acknowledging such a failure in intelligence would reveal a bind
spot and harm national security, that argument is lacking.  America's intelligence failures are
no secret and have been publicly criticized.  Uri Friedman, *The Ten Biggest American*
*Intelligence Failures*, Foreign Policy (Jan. 3, 2012. 2:39 AM),
https://foreignpolicy.com/2012/01/03/the-ten-biggest-american-intelligence-failures/.

- A third distinct source of embarrassment is the clear possibility that the intelligene agencies
were well aware of the threat to Mr. Khashoggi, but were ordered from above not to act on
the threat.  Defendants' own findings as to Saudi Arabia's involvement in the murder of Mr.
Khashoggi are unmistakable. *See, e.g.,* Shane Harris et al., CIA Concludes Saudi Crown
Prince Ordered Jamal Khashoggi's Assassination, Wash. Post (Nov. 16, 2018),

https://www.washingtonpost.com/world/national-security/cia-concludes-saudi-crown-prince-ordered-jamal-khashoggis-assassination/2018/11/16/98c89fe6-e9b2-11e8-a939-9469f1166f9d_story.html.  Yet the U.S. government has appeared alarmingly disinterested in the details of its ally's involvement, and from the very top has stated a preference to not let the murder damage the countries' strategic relationship.  *See* Michael D. Shear, *Trump Shrugs Off Khashoggi Killing by Ally Saudi Arabia*, N.Y. Times (Jun. 23, 2019), https://www.nytimes.com/2019/06/23/us/politics/trump-khashoggi-killing-saudi-arabia.html; Jon Swaine, *Trump Dismisses UN Request for FBI to Investigate Jamal Khashoggi's Murder*, The Guardian (Jun. 23, 2019), https://www.theguardian.com/world/2019/jun/23/jamal-khashoggi-trump-un-request-fbi-investigation; Mark Landler, In Extraordinary Statement, Trump Stands with Saudis Despite Khashoggi Killing (Nov. 20, 2018), https://www.nytimes.com/2018/11/20/world/middleeast/trump-saudi-khashoggi.html.  It stands to reason that if the Government had prior knowledge of the threat to Mr. Khashoggi's life, executive branch leadership would have shown a similar disinterest as it has shown—to widespread condemnation—after the fact.  The Government's open placement of strategic and financial concerns above human rights is deeply at odds with the views of the American people.  *See, e.g.*, Washington Post-Schar School Battleground Districts Poll Oct. 25-28 (Oct. 29, 2018), https://apps.washingtonpost.com/g/page/politics/washington-post-schar-school-battleground-districts-poll-oct-25-28/2345/?tid=lk_inline_manual_24 (84% of those polled believe top Saudi leaders were trying to cover up what happened to Mr. Khashoggi and that 55% thought that if Saudi leaders had ordered Mr. Khashoggi's murder, the U.S. should cut back ties with Saudi Arabia); Gallup, Country Ratings,

https://news.gallup.com/poll/1624/perceptions-foreign-countries.aspx (finding that as of

February 2019, 67% of Americans have an unfavorable view of Saudi Arabia, a 12%

increase from the prior year).  While the Government may want to avoid the embarrassment

of having to justify its widely condemned indifference to the murder and prioritization of

weapons sales, *see* Nahal Toosi, *Trump's Deference to Saudi Arabia Infuriates Much of*

*D.C.*, Politico (Sep. 16, 2019), https://www.politico.com/story/2019/09/16/saudi-trump-oil-

iran-1498147;  Daniel Politi, *Trump Brushes Off Call for FBI Probe Into Khashoggi, Cites*

*Importance of Saudi Arms Sales*, Slate (Jun. 23, 2019), https://slate.com/news-and-

politics/2019/06/trump-dismisses-fbi-investigation-khashoggi.html, that does not constitute a

legal basis under which the Government can justify its *Glomar* responses.

- The Government also may be seeking not to disclose the extemnt to which it spies on its

   allies.  Such information is, in fact, neither shocking nor a justification for classifying

   information or for *Glomar* responses.  *See* Max Fisher, *Why America Spies on Its Allies (and*

   *Probably Should)*, Wash. Post (Oct. 29, 2013),

   https://www.washingtonpost.com/news/worldviews/wp/2013/10/29/why-america-spies-on-

   its-allies-and-probably-should/; Jonathan Marcus, *NSA Spying Allegations: Are US Allies*

   *Really Shocked?*, BBC (Oct. 26, 2013), https://www.bbc.com/news/world-europe-24676392.

Accordingly, close review of the Government's position is in order here.  *See Jones v.*

*FBI*, 41 F.3d 238, 243 (6th Cir. 1994) (If "it becomes apparent that the subject matter of a

request involves activities which, if disclosed, would publicly embarrass the agency . . . government affidavits lose credibility.").[56]

Similarly, the Government may not impermissibly delay release of information about the duty to warn Mr. Khashoggi. See Order Section 1.7(a)(4) ("In no case shall  information be classified . . . in order to . . . prevent or delay the release of information that does not require protection in the interest of the national security").  Almost one year has passed since Mr. Khashoggi was assassinated.  Plaintiff has sought clarity concerning this tragic event for almost one year as well.  This delay is expressly prohibited by Section 1.7(a)(4) of the Order.

## IV.    As An Alternative, The Court Can And Should Require More Detailed Affidavits From The Government As Well As *In Camera* Review Of Responsive Documents.

CPJ appreciates that, despite Defendants' clear failure to meet their burden under FOIA thus far, the Court may wish to proceed cautiously given the intelligence community's position. CPJ therefore notes that the Court has discretion to order that Defendants submit additional affidavits, either publicly or confidentially.  The Court also can order the submission of responsive documents, to the extent they exist, for *in camera* review.  *See* 5 U.S.C. § 552(a)(4)(b) (stating that a court may examine agency records "in camera to determine whether such records or any part shall be withheld" under applicable exemptions);  *See Jones*, 41 F.3d at 243 (ordering *in camera* review of documents; "[i]n certain circumstances the court must play a more active role because no other party or institution is available to ensure that the agency's

---

[56] Saudi Arabia is a recognized ally of the United States.  According to the U.S. Department of State, the United States and Saudi Arabia have had a relationship since 1931.  *See* U.S. Department of State, U.S. Relations With Saudi Arabia: Bilateral Relations Fact Sheet, Bureau of Near Eastern Affairs (Aug. 7, 2018), https://www.state.gov/u-s-relations-with-saudi-arabia.

assertions are reliable.").  The exercise of that discretion would be appropriate in this case if there is any hesitation about simply ordering full and prompt FOIA compliance.

As noted above, the Defendants' conclusory justifications for *Glomar* responses are plainly insufficient and, at the very least, deserving of closer scrutiny.  *See Hayden v. Nat'l Sec. Agency/Cent. Sec. Serv.*, 608 F.2d 1381, 1387 (D.C. Cir. 1979) (affidavits are inadequate if "the agency's claims are conclusory, merely reciting statutory standards, or if they are too vague or sweeping.").  Strikingly, no agency explains exactly how information about its consideration of Directive 191 obligations as it relates to Mr. Khashoggi – including, potentially, redacted information – could reasonably be expected to expose intelligence, sources, and methods.  Yet that is a requirement for both claimed exemptions.  Defendants instead generally recite the statutory standards without meaningful explanation or connection to this case.

Recognizing that *in camera* inspection is not typically favored in national security cases, *Mobley v. CIA*, 806 F.3d 568, 588 (D.C. Cir. 2015), *in camera* review is appropriate here because of the unique circumstances in this case: the remarkable amount of information already acknowledged by the U.S. and Saudi governments; the enormous U.S. and global demand for further transparency; and the clear threat to American values posed by the Government's public disinterest in human rights considerations.  CPJ respectfully submits that these factors warrant heightened scrutiny into Directive 191 compliance, via more detailed affidavits and via *in camera* review to the extent the Court deems appropriate.  Such relief would not require the Government to abandon its position in the first instance.

[remainder of page intentionally left blank]

## **CONCLUSION**

CPJ respectfully requests that the Court grant its cross-motion for summary judgment, or in the alternative, order the Defendants to submit more detailed affidavits justifying their *Glomar* responses, to be reviewed *in camera* with responsive documents, if they exist, if necessary.  CPJ requests that the Court deny the Defendants' motion for summary judgment.

Respectfully submitted,

/s/ Timothy K. Beeken
Timothy K. Beeken (NY0083)
Jeremy Feigelson (admitted *pro hac vice*)
Alexandra P. Swain (admitted *pro hac vice*)
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022
(212) 909-6000
tkbeeken@debevoise.com
jfeigelson@debevoise.com
apswain@debevoise.com

*Counsel for Plaintiff Committee to Protect
Journalists*

September 26, 2019

<div style="text-align:center">

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

</div>

| | |
|---|---|
| KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA UNIVERSITY, <br><br> COMMITTEE TO PROTECT JOURNALISTS, <br><br>         Plaintiffs, <br><br>    v. <br><br> CENTRAL INTELLIGENCE AGENCY, *et al.*, <br><br>         Defendants. | Civil Action No. 1:18-cv-2709 (TNM) |

<div style="text-align:center">

**PLAINTIFF COMMITTEE TO PROTECT JOURNALISTS' STATEMENT OF MATERIAL FACTS**

</div>

Pursuant to Local Civil Rule 7(h)(1), Plaintiff Committee to Protect Journalists ("CPJ") respectfully submits the following statement of material facts as to which there is no genuine dispute.[1]

**I.**     **Known Facts Regarding the Murder of Jamal Khashoggi**

1. Jamal Khashoggi was a U.S. resident, a Saudi dissident, and internationally recognized journalist known for his human rights and press freedom advocacy in the Middle East.

2. As a columnist for *The Washington Post* and editor-in-chief of Al-Arab News Channel, Mr. Khashoggi's journalism regularly featured criticisms of the Saudi government, and in

---

[1]   Facts independently related to former Defendant Department of State ("DoS") and its response to Plaintiffs' FOIA requests are not addressed as DoS has been dismissed from this suit, without prejudice to Plaintiffs' ability to seek attorney's fees at a later point in these proceedings.

particular the Saudi Crown Prince Mohammed bin Salman (the "Crown Prince"). Declaration of Alexandra P. Swain ("Swain Decl.") Ex. 1.

3. On October 2, 2018, Mr. Khashoggi arrived at the Saudi consulate in Istanbul, Turkey to obtain documentation for his upcoming marriage to his Turkish fiancé, Hatice Cengiz. Swain Decl. Ex. 2.

4. When Mr. Khashoggi failed to emerge from the consulate, his fiancé contacted the Turkish police.  Swain Decl. Ex. 3.

5. The Turkish police and a prosecutor initiated an investigation into his disappearance. Swain Decl. Ex. 4.

6. On October 5, 2018, the Crown Prince stated that Mr. Khashoggi had left the Saudi consulate and that the government had nothing to hide.  Swain Decl. Ex. 5.

7. On October 10, 2018, the Turkish media released images of a fifteen-member team of Saudi agents allegedly responsible for Mr. Khashoggi's murder.  Swain Decl. Ex. 6.

8. Later, on October 20, 2018, the Saudi government conceded that Mr. Khashoggi was killed in their consulate and that an investigation was underway.  Swain Decl. Ex. 7.

9. The following month, in November, the Central Intelligence Agency ("CIA") concluded that the Crown Prince likely ordered Mr. Khashoggi's killing.  Swain Decl. Ex. 8.

10. Audio transcriptions, later released by Turkish intelligence agencies, revealed that once Mr. Khashoggi was grabbed in the consulate, Mr. Khashoggi struggled and repeatedly pleaded for his life while a team of Saudi agents strangled him.  Swain Decl. Ex. 9.

11. Mr. Khashoggi's body was also mutilated, and the current whereabouts of his remains are unconfirmed.  *Id*.

12.   On September 26, 2019, the Crown Prince reportedly claimed "all the responsibility" for the killing of Khashoggi, while still denying that he had prior knowledge of the plan. Swain Decl. Ex. 10.

## II.   The Duty to Warn

13.   The Intelligence Community, pursuant to Intelligence Community Directive 191 ("Directive 191"), has a duty to warn individuals or groups about threats of intentional killing, serious bodily injury, and kidnapping.  Swain Decl. Ex. 11.

14.   Directive 191 equally applies to both U.S. persons and non-U.S. persons and requires intelligence community elements to document and maintain records in relation to actions taken pursuant to the duty to warn.  *Id.*

## III.   Public Response to Jamal Khashoggi's Murder

15.   Mr. Khashoggi's disappearance and the facts surrounding his murder have prompted interest from U.S. officials, foreign governments, and international human rights groups.

16.   For example, a week after Mr. Khashoggi's death, the Senate Foreign Relations Committee issued a letter to the President pursuant to the Global Magnitsky Human Rights Accountability Act (the "Global Magnitsky Act")[2] which required the President to make a determination on the imposition of sanctions pursuant to the Global Magnitsky Act with respect to any foreign person responsible for violations related to Mr. Khashoggi.  Swain Decl. Ex. 12.

---

[2]   The Global Magnitksy Act requires the President to determine whether a foreign person is responsible for an extrajudicial killing, torture, or other gross violation of internationally recognized human rights against an individual exercising freedom of expression.

17.   On October 22, 2018, over fifty congressional representatives sent a letter to Director of National Intelligence Daniel Coats inquiring about what actions were taken by the U.S. intelligence agency relating to Directive 191 and Mr. Khashoggi.  The following week, another group of senators sent a letter to Director of National Intelligence Daniel Coats, dated October 30, 2018, addressing Directive 191 and. Mr. Khashoggi's murder.  Swain Decl. Ex. 13.

18.   On December 13, 2018, the Senate unanimously passed a resolution that held the Crown Prince personally responsible for the death of Mr. Khashoggi.  In the same session, the Senate also invoked the War Powers Act, and voted to end U.S. military assistance to Saudi Arabia over Mr. Khashoggi's killing.  Swain Decl. Ex. 14.

19.   In December 2018, CIA director Gina Haspel briefed Senate committees on the matter, resulting in senators making public statements about the killing.  Swain Decl. Ex. 15.

20.   In the year since Mr. Khashoggi's death, Congress has urged for a public investigation, introducing legislation requiring a public report on the killing of Mr. Khashoggi, Swain Decl. Ex. 16, and the Saudi Arabia Diplomatic Review Act of 2019 ("SADRA"), a bill to mandate an Executive Branch review of America's relationship with the Saudi government.  Swain Decl. Ex. 17.

21.   In a June 23, 2019 interview, President Donald Trump stated that Mr. Khashoggi's murder had already been "heavily investigated."  Swain Decl. Ex. 18.  When asked about whether the U.S. arms deals with Saudi Arabia allowed him to "overlook some of [Saudi Arabia's] bad behavior," he said that: "the Middle East … is a hostile place" and Saudi Arabia continues to buy "massive amounts, $150 billion worth of military equipment …

So Saudi Arabia is a big buyer of America product. That means something to me. It's a big producer of jobs." *Id*.

## IV.   Acknowledgment of Responsive Records

22.   The CIA and the Office of Director of National Intelligence ("ODNI") have both, in a separate litigation proceeding, acknowledged the existence of "records relating to the killing of U.S. resident Jamal Khashoggi, including but not limited to the CIA's findings on and/or assessment of the circumstances under which he was killed and/or the identities of those responsible," Swain Decl. Ex. 19.  Swain Decl. Ex. 20.

## V.   Plaintiffs' Narrow FOIA Requests and Defendants' Responses

23.   On October 19 2018, then-plaintiff, the Knight Institute of Columbia University ("the Knight Institute"), sent the following FOIA requests to the CIA, Federal Bureau of Investigation ("FBI"), National Security Agency ("NSA"), and ODNI (collectively "Defendants") seeking records related to the Government's duty to warn and any records the Defendants may have in relation to the duty to warn as it relates to Mr. Khashoggi:

Request 1:  Procedures or guidance for determining whether to warn, or for delivering a warning to, an intended victim or those responsible for protecting the intended victim, pursuant to Directive 191.

Request 2:  Records concerning the duty to warn under Directive 191 as it relates to Jamal Khashoggi, including any records relating to duty to warn actions taken with respect to him.

Request 3:  Records concerning any issue arising among IC elements regarding a determination to warn Khashoggi or waive the duty to warn requirement, or regarding the method for communicating threat information to him.

Request 4 (for ODNI only):  Records relating to any dispute referred to the ODNI regarding a determination to warn Khashoggi or waive the duty to warn requirement, or regarding the method for communicating threat information to him.

First Amended Complaint ("FAC"), Dkt. No. 17, ¶¶ 15, 17; Dkt. No. 17-1.

24.    On November 20, 2018, after the Defendants failed to respond to the Knight

Institute's FOIA requests within the statutorily mandated time period, the Knight

Institute initiated the instant lawsuit to compel the Defendants to produce

responsive documents.  Dkt. No. 1

25.    Also on November 20, 2018, Plaintiff CPJ submitted substantively identical FOIA

requests to the same agencies.  FAC, Dkt. No. 17-2

26.    On January 17, 2019, the Knight Institute filed its First Amended Complaint,

adding CPJ as a plaintiff.  FAC, Dkt. No. 17.

27.    The Defendants processed the Plaintiffs' FOIA requests and responded as

follows[3]:

### A.    ODNI

28.    On February 14, 2019, ODNI informed the Plaintiffs that it had conducted and completed

a search as to Request 1, and had located responsive records, all of which had originated

with other Defendant agencies.  Decl. of Patricia Gaviria ("Gaviria Decl.") ¶ 12.  ODNI

informed the Knight Institute and CPJ that these records had been referred to the

respective other agencies for processing and production, because all responsive records

originated with other Defendant agencies.  *Id.*

29.    ODNI also informed the Plaintiffs that, pursuant to FOIA Exemptions 1 and 3, it could

neither confirm nor deny the existence of records responsive to Requests 2, 3, or 4.  *Id.*

ODNI explained that the fact of the existence or nonexistence of such records "is itself

currently and properly classified, and could reveal intelligence sources and methods

---

[3]    None of the Defendants issued Glomar responses to FOIA Request 1, so these responses are
not addressed in detail.

information that is protected from disclosure pursuant to Section 102A(i)(1) of the
National Security Act of 1947[.]"  *Id.*

**B.     NSA**

30.   On March 11, 2019, the NSA informed the Plaintiffs that it had completed a search as to
      Request 1, and had located two responsive records, totaling 21 pages, which it
      simultaneously produced.  Decl. of Linda M. Kiyosaki ("Kiyosaki Decl.") ¶ 13.  The
      NSA claimed that, under FOIA Exemptions 1 and 3, it could neither confirm nor deny the
      existence of records responsive to Requests 2 or 3.  *Id.*  The NSA stated that the fact of
      the existence or nonexistence of such records "is a currently and properly classified
      matter," and that "the existence or non-existence of the information" is protected from
      disclosure by 18 U.S.C. § 798, 50 U.S.C. §§ 3024(i), 3605.  *Id.*

**C.     CIA**

31.   On March 15, 2019, the CIA informed the Plaintiffs that it had conducted and completed
      a search as to Request 1, and had located responsive records.  Decl. of Antoinette B.
      Shiner ("Shiner Decl.") ¶ 13 & fn. 3.  For Request 1, the CIA produced three records with
      redactions, totaling 19 pages, and withheld in full two additional records.  *Id.*  The CIA
      claimed the redactions were pursuant to FOIA Exemption 1 and 3, and that it withheld
      two documents in full under FOIA Exemptions 1, 3, 5, and 6.  *Id.*  Additionally, CIA
      informed the Plaintiffs that, for Requests 2 or 3, it claimed FOIA Exemptions 1 and 3,
      and thus could neither confirm nor deny the existence of such records.  *Id.*

32.   The CIA also claimed that, pursuant to FOIA Exemptions 1 and 3, it could neither
      confirm nor deny the existence of records responsive to Requests 2 or 3.  Shiner Decl. ¶
      13.  The CIA explained that the fact of the existence or nonexistence of such records "is

7

itself currently and properly classified and relates to CIA intelligence sources and methods information that is protected from disclosure by Section 6 of the CIA Act of 1949, 50 U.S.C. § 3507, and Section 102A(i)(1) of the National Security Act of 1947, 50 U.S.C. § 3024(i)(1)." *Id.*

D.   **FBI**

33.   On March 29, 2019, the FBI informed the Plaintiffs that it had conducted and completed a search as to Request 1, and had located eight responsive records, totaling thirty-three pages, which it simultaneously produced, in part.  With respect to Requests 2 or 3, the FBI informed the Plaintiffs it could neither confirm nor deny the existence of such records.  The Defendant claimed that "the mere acknowledgement of such records['] existence or nonexistence would in and of itself trigger harm to national security interests per Exemption (b)(1) and/or reveal intelligence sources and methods per Exemption (b)(3); 50 U.S.C. § 3024(i)(1)."  Decl. of David M. Hardy ("Hardy Decl.") Defs.' Ex. C, at 2.

34.   On May 14, 2019, the FBI released a single additional page pursuant to its March 29, 2019 production. *Id.* at Defs.' Ex. D.

VI.   **Issues for Resolution by the Court**

35.   In a Joint Status Report filed on June 28, 2019, the parties proposed a schedule for further proceedings, including a proposal that Plaintiffs identify all issues and challenges by July 12, 2019.  Dkt. No. 28.

36.   On July 1, 2019, the Court adopted this proposal.  July 1, 2019 Minute Order.

37.   On July 12, 2019, Plaintiff CPJ informed the Defendants that it would challenge the Glomar responses for the FBI, CIA, ODNI, and the NSA.  Defs.' Ex. 1.  CPJ also requested that the CIA provide a Vaughn Index and expressed its intention to challenge the CIA's redactions with respect to the three documents that it provided, the remaining documents that it withheld in response to item 1 in the FOIA request, and the remaining documents it withheld in coordination with the Department of State.  *Id.*

38.   On July 18, 2019 then-Plaintiff Knight Institute voluntarily dismissed its claims against all Defendants, without prejudice to its ability to seek an award of attorney's fees and other litigation costs at a later point in these proceedings.  Dkt. No. 29; *see also* July 19, 2019 Minute Order (ordering the stipulation of dismissal).

39.   On July 25, 2019, Plaintiff CPJ dismissed all claims against then Defendant DoS, also without prejudice to seek attorney's fees and costs from DoS at a later point in the litigation.  Dkt. No. 30; see also July 30, 2019 Minute Order (ordering DoS' dismissal).

[Remainder of the page intentionally left blank.]

40.    In accordance with the July 1, 2019 Order, on August 28, 2019, Defendants filed a

Motion for Summary Judgment along with public affidavits.  Dkt No. 34.  Additionally,

Defendant CIA filed the requested Vaughn Index.  *Id.*

Dated: New York, NY                          Respectfully submitted,
       September 26, 2019

                                    /s/ Timothy K. Beeken
                           Timothy K. Beeken (NY0083)
                           Jeremy Feigelson (admitted *pro hac vice*)
                           Alexandra P. Swain (admitted *pro hac vice*)
                           DEBEVOISE & PLIMPTON LLP
                           919 Third Avenue
                           New York, NY 10022
                           (212) 909-6000
                           tkbeeken@debevoise.com
                           jfeigelson@debevoise.com
                           apswain@debevoise.com

                           *Counsel for Plaintiff Committee to Protect
                               Journalists*

10