UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA UNIVERSITY, *et al.*,<br><br>               Plaintiffs,<br><br>               v.<br><br>CENTRAL INTELLIGENCE AGENCY, *et al.*,<br><br>               Defendants. | Case No. 1:18-cv-02709 (TNM) |

## **MEMORANDUM OPINION**

This case stems from the murder and dismemberment of Jamal Khashoggi inside the Saudi Arabian consulate in Istanbul. While his fiancée waited outside for his return with their marriage papers, members of a hit squad dispatched from Riyadh lay in wait in a consular office inside. He was never seen again.

Turkish intelligence captured audio of Khashoggi's last moments. After the consular staff escorted him inside, the assailants pressured him to return to Saudi Arabia. When he refused, there was a struggle as his killers hooded him in plastic and strangled him. Then they dismembered his body with a surgical bone saw. Later, surveillance footage captured Saudi agents transporting his remains in plastic bags and a suitcase. A body double dressed in Khashoggi's clothes left a false trail out of the consulate, the final piece laid in the premeditated attack.

The trail soon proved false, and the evidence pointed to disappearance at the hands of Saudi officials, frequent targets of the slain journalist's criticism. Intelligence agencies, governments, and reporters quickly confirmed the worst. A U.N. Special Rapporteur convened

an investigation.[1]  The State Department informed the press that "the United States had no advanced knowledge" of his disappearance.[2]  Congress demanded to know how much the Saudi government knew about the disappearance of this U.S. resident last seen entering its consulate.[3]  Everything, the CIA said.  Senators left a classified briefing certain that the Saudi Arabian Crown Prince directed the killing.[4]  The State Department publicly designated 16 Saudi Arabian officials as ineligible to enter the United States because of their roles in this "significant corruption or gross violation[] of human rights."[5]  The Treasury Department issued sanctions against those 16, plus the consul general.[6]

Shortly after his disappearance, the Knight First Amendment Institute ("Knight Institute") sought from the CIA, FBI, NSA, and Office of the Director of National Intelligence (collectively, the "Intelligence Agencies") records related to the Intelligence Community's "duty to warn" Khashoggi of the attack.  The Committee to Protect Journalists ("CPJ") then sent a nearly identical request.  When the Intelligence Agencies did not respond, Knight Institute and the CPJ sued under the Freedom of Information Act ("FOIA") to force the release of records.

---

[1] This account is based on the Special Rapporteur's final report:  Agnes Callamard (Special Rapporteur on Extrajudicial, Summary or Arbitrary Executions), *Investigation into the Unlawful Death of Mr. Jamal Khashoggi*, U.N. Doc. A/HRC/41/CRP.1, annex (June 19, 2019).

[2] Press Briefing, Dep't of State (Oct. 10, 2018), https://www.state.gov/briefings/department-press-briefing-october-10-2018/.

[3] Press Release, Sen. F.R. Comm., *Corker, Menendez, Graham, Leahy Letter Triggers Global Magnitsky Investigation into Disappearance of Jamal Khashoggi* (Oct. 10, 2018), https://www.foreign.senate.gov/press/chair/release/corker-menendez-graham-leahy-letter-triggers-global-magnitsky-investigation-into-disappearance-of-jamal-khashoggi.

[4] *See, e.g.*, Press Release, Sen. F.R. Comm., *Video: Menendez Reacts to Briefing from CIA Director on Saudi Arabia's Involvement in Khashoggi Murder* (Dec. 4, 2018), https://www.foreign.senate.gov/press/ranking/release/video-menendez-reacts-to-briefing-from-cia-director-on-saudi-arabias-involvement-in-khashoggi-murder-.

[5] Media Note, Dep't of State, *Public Designation of Sixteen Saudi Individuals Under Section 7031(c) of the FY 2019 Department of State, Foreign Operations, and Related Programs Appropriations Act* (Apr. 8, 2019), https://www.state.gov/public-designation-of-sixteen-saudi-individuals-under-section-7031c-of-the-fy-2018-department-of-state-foreign-operations-and-related-programs-appropriations-act/.

[6] Press Release, Dep't of Treasury, *Treasury Sanctions 17 Individuals for Their Roles in the Killing of Jamal Khashoggi* (Nov. 15, 2018), https://home.treasury.gov/news/press-releases/sm547.

But still the Intelligence Agencies would not acknowledge the existence of any relevant documents.

The parties have cross-moved for summary judgment, now ripe for decision. Even in appalling cases such as this, the law recognizes that our Government needs secrecy to discover what others do in secret. Because the requested records are exempt from FOIA's disclosure requirements, the Court will grant summary judgment to the Intelligence Agencies.

I.

Any element of the Intelligence Community "that collects or acquires credible and specific information indicating an impending threat of intentional killing, serious bodily injury, or kidnapping," must warn the intended victim "in a timely manner while protecting sources and methods." Intelligence Community Directive 191 ("Directive 191") ¶¶ E.1, F.1. (Office of the Dir. of Nat'l Intel. Jul. 21, 2015).

Under FOIA, 5 U.S.C. § 552, Knight Institute and the CPJ requested all Intelligence Agency records related to Directive 191 and the duty to warn Khashoggi. *See* Am. Compl. ¶¶ 15–17, ECF No. 17. They also requested records of disputes the other agencies referred to Office of the Director of National Intelligence ("ODNI") about the duty to warn or how to communicate threat information. *See id*. ¶ 18.[7]

---

[7] The FOIA request was in four parts: "(1) All procedures or guidance for determining whether to warn, or for delivering a warning to, an intended victim or those responsible for protecting the intended victim, pursuant to Directive 191; (2) All records concerning the duty to warn under Directive 191 as it relates to Jamal Khashoggi, including any records relating to duty to warn actions taken with respect to him; (3) All records concerning any 'issue aris[ing] among IC elements' regarding a determination to warn Jamal Khashoggi or waive the duty to warn requirement, or regarding the method for communicating threat information to him. *See* Directive 191, § G.1.; and (4) All records relating to any dispute referred to the DNI regarding a determination to warn Jamal Khashoggi or waive the duty to warn requirement, or regarding the method for communicating threat information to him. *See* Directive 191, § G.2." Am. Compl. ¶¶ 17–18.

3

The Intelligence Agencies responded with what are known as "*Glomar* responses:" refusals to confirm or deny the existence of the requested records.[8] *See, e.g.*, Joint Status Report (Mar. 1, 2019), ECF No. 25. Knight Institute subsequently voluntarily dismissed its claims, leaving the CPJ as the sole plaintiff. *See* Stipulation of Dismissal, ECF No. 29; Minute Order (Jul. 19, 2019). The State Department was originally also listed as a defendant, but the CPJ dismissed State from the case shortly after Knight Institute dropped out. *See* Motion to Dismiss, ECF No. 30; Minute Order (Jul. 30, 2019).

The remaining defendants filed for Summary Judgment, arguing that FOIA exemptions 1 and 3 prevent the disclosure of the very existence *vel non* of the requested records. Defs.' Mot. for Summ. J. ("Defs.' Mot.") 2, ECF No. 34-1; 5 U.S.C. § 552(b)(1), (3). The CPJ then filed a cross-motion, arguing against the exemptions and that the State Department's denial of advance warning about Khashoggi's disappearance "constitutes an official acknowledgment by the Government that records responsive to CPJ's FOIA requests do not exist, and thereby waives the Government's ability to invoke *Glomar*." Pl.'s Cross-Mot. for Summ. J. ("Pl.'s Cross-Mot.") 21, 23, ECF No. 37-1; *see* Press Briefing, Dep't of State, *supra*, note 2.

## II.

The general rule under FOIA is that government agencies "must acknowledge the existence of information responsive to a FOIA request and provide specific, non-conclusory justifications for withholding that information." *Roth v. U.S. Dep't of Justice*, 642 F.3d 1161, 1178 (D.C. Cir. 2011). This is so because FOIA exists as "a means for citizens to know what their Government is up to." *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 171–72 (2004) (cleaned up).

---

[8] The CIA also withheld documents in whole or part, but the CPJ elected not to challenge the redactions or withholdings on Summary Judgment. *See* Pl.'s Cross-Mot. for Summ. J. 19, n.54, ECF No. 37-1.

The *Glomar* line of FOIA cases stands as an exception to that general rule. *ACLU v. CIA*, 710 F.3d 422, 426 (D.C. Cir. 2013).[9] In a *Glomar* response, an agency may "refuse to confirm or deny the existence of records," *Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007), when doing so "would itself cause harm cognizable" under FOIA, *Roth*, 642 F.3d at 1178. In other words, FOIA protects "the existence *vel non*" of the records. *Wolf*, 473 F.3d at 379. And agencies commonly invoke *Glomar* responses when "admission or denial could itself compromise national security." *See Military Audit Project v. Casey*, 656 F.2d 724, 729–30 (D.C. Cir. 1980).

Naturally, the *Glomar* exception has its limits. If an agency has "officially acknowledged otherwise exempt information through prior disclosure, the agency has waived its right to claim an exemption with respect to that information." *Id*. at 426. Put another way, a "plaintiff can overcome a *Glomar* response by showing that the agency has already disclosed the fact of the existence (or nonexistence) of responsive records, since that is the purportedly exempt information that a *Glomar* response is designed to protect." *Id*. at 427 (citations omitted).

A plaintiff who raises a claim of official acknowledgment bears "the initial burden of pointing to specific information in the public domain that appears to duplicate that being withheld." *Wolf*, 473 F.3d at 378 (quotation omitted). The question is whether "the prior disclosure establishes the *existence* (or not) of records responsive to the FOIA request, regardless whether the contents of the records have been disclosed." *Marino v. DEA*, 685 F.3d 1076, 1081 (D.C. Cir. 2012) (quotation omitted). If a plaintiff makes the initial showing, it is the agency's burden "to sustain its action." 5 U.S.C. § 552(a)(4)(B).

---

[9] The name comes from the CIA's refusal in *Phillippi v. CIA* to confirm or deny whether it had any records of Howard Hughes' *Glomar Explorer* ship that was reportedly used to search for a lost Soviet submarine. 546 F.2d 1009 (D.C. Cir. 1976); *see ACLU*, 710 F.3d at 426 n.1.

5

Here, the Intelligence Agencies rely on FOIA Exemptions 1 and 3. Exemption 1 protects matters that are "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1). In this case, the Intelligence Agencies invoke Executive Order 13,526, which authorizes the classification of information that "pertains to," among other things, "intelligence activities (including covert action), intelligence sources or methods, or cryptology." Exec. Order No. 13,526 § 1.4(c), 75 Fed. Reg. 707 (Dec. 29, 2009).

Exemption 3 applies to matters "specifically exempted from disclosure by [a] statute" other than FOIA. 5 U.S.C. § 552(b)(3). To support the Exemption 3 claims, the Intelligence Agencies rely on the National Security Act of 1947, which provides that the "Director of National Intelligence shall protect intelligence sources and methods from unauthorized disclosure." 50 U.S.C. § 3024(i)(1); *see Miller v. Casey*, 730 F.2d 773, 777 (D.C. Cir. 1984) (holding that provision in predecessor version of the Act supports Exemption 3).[10]

"An agency is entitled to summary judgment if no material facts are in dispute and if it demonstrates that each document that falls within the class requested either has been produced or is wholly exempt from the Act's inspection requirements." *Students Against Genocide v. Dep't of State*, 257 F.3d 828, 833 (D.C. Cir. 2001) (cleaned up). The Court reviews "*de novo* the agency's use of a FOIA exemption to withhold documents," but "in the context of national

---

[10] The NSA also justifies its Exemption 3 claims with two additional statutes. First, it relies on the National Security Agency Act of 1959, which protects from disclosure "the organization or any function of the National Security Agency, or any information with respect to the activities thereof." 50 U.S.C. § 3605(a); *see Linder v. NSA*, 94 F.3d 693, 698 (D.C. Cir. 1996) ("The protection afforded by [this section] is, by its very terms, absolute."). Second, the NSA invokes 18 U.S.C. § 798(a), which establishes criminal sanctions for the unauthorized release or use of classified information "concerning the communication intelligence activities of the United States . . . or obtained by the processes of communication intelligence from the communications of any foreign government." The Court notes these other authorities but finds no need to reach them.

security concerns, courts must accord *substantial weight* to an agency's affidavit concerning the details of the classified status of the disputed record." *ACLU*, 710 F.3d at 427 (quotations omitted). "Ultimately, an agency's justification for invoking a FOIA exemption, whether directly or in the form of a *Glomar* response, is sufficient if it appears logical or plausible." *Id*. (quotations omitted). If the agency's affidavit meets these criteria, "then summary judgment is warranted on the basis of the affidavit alone." *ACLU v. DOD*, 628 F.3d 612, 619 (D.C. Cir. 2011) (citation omitted).

### III.

The central issue here is whether the State Department's press briefing a week after Khashoggi's as-yet-publicly-unconfirmed killing constituted an "official" disclosure that overcomes the Intelligence Agencies' *Glomar* responses. See *ACLU*, 710 F.3d at 427. In response to a reporter's question, a State spokesperson said, "although I cannot comment on intelligence matters, I can say definitively the United States had no advanced knowledge of Jamal Khashoggi's disappearance." Press Briefing, Dep't of State, *supra*, note 2.

Recall that the CPJ voluntarily dismissed its claims against the State Department. *See* Motion to Dismiss, ECF No. 30; Minute Order (Jul. 30, 2019). That is significant because "a disclosure made by someone other than the agency from which the information is being sought" is not "official." *Frugone v. CIA*, 169 F.3d 772, 774 (D.C. Cir. 1999). And this holds whether the information reaches the public through Congress, a former official, the media, or a sister Executive Branch agency. *Id*. (citations omitted).

*Frugone* controls here. In it, a Chilean resident who claimed he had been a CIA "covert employee" contacted the Office of Personnel Management ("OPM") about retirement benefits. *Id*. at 773. OPM informed him by letter that the CIA maintained his records. *Id*. But when he

contacted the CIA, it denied his request with a *Glomar* response. *Id*. After he sued under FOIA, the CIA explained that "except in those instances wherein we have officially acknowledged a relationship with an individual, we are unable to so acknowledge." *Id*.

The issue presented in *Frugone* should appear familiar: "whether the CIA may give a so-called *Glomar* response where another Executive Branch agency has already confirmed [the fact at issue]." *Id*. at 774 (cleaned up). The court held that "only the CIA can waive its right to assert an exemption to the FOIA." *Id*. at 775. Crediting the CIA's affidavit, the D.C. Circuit noted that "requiring it to break its silence upon the subject . . . would harm the interests of the United States." *Id*. On the one hand, confirmation of his employment "could cause greater diplomatic tension between Chile and the United States than do the informal, possibly erroneous, statements made by the OPM." *Id*. And on the other, a denial "would lessen the burden facing a foreign intelligence agency attempting to track the CIA's covert activities abroad." *Id*. Neither option was appealing. Just as Knight Institute's decision to dismiss this case did not require the CPJ to do likewise, one agency cannot bind another for *Glomar* purposes.

The CPJ's attempts to distinguish *Frugone* are unavailing. The CPJ argues that the State Department is "not just any agency." Pl.'s Reply 12, ECF No. 41 ("It is the oldest federal agency and the most prestigious, exemplified by the Secretary of State's place near the top of the presidential line of succession."). Perhaps. But venerable as the State Department is, it is still a sister to the Intelligence Agencies here, no more able to speak about intelligence matters on behalf of "the entire United States Government," *id*. at 15, than OPM could speak for the CIA, *Frugone*, 169 F.3d at 774. Less so, arguably, given that OPM has some supervisory duties over executive agencies, *see* 5 U.S.C. §§ 1101–1104, while State is a small fry in the Intelligence Community pond where the Director of National Intelligence rules, *see* 50 U.S.C. § 3023.

The CPJ cites *Marino v. DEA*, but it is not to the contrary. *See* Pl.'s Reply at 13 n.1 (citing 685 F.3d at 1082). There, the D.C. Circuit found that information an assistant U.S. attorney disclosed in a criminal trial could be considered in the "public domain" for purposes of a FOIA request against the DEA. 685 F.3d at 1082. But this was so because the DEA is a "component *within* the Department of Justice." *Id*. (citing *Davis v. DOJ*, 968 F.2d 1276, 1279–82 (D.C. Cir. 1992)). And that relationship reveals the CPJ's flawed analogy. State enjoys no similar parent-agency status vis-à-vis the remaining defendant agencies. *See* 50 U.S.C. § 3003(4) ("intelligence community" includes all Intelligence Agencies and the State Department's Bureau of Intelligence and Research); *id*. § 3023(b) (designating Director of National Intelligence "head of the intelligence community").

Next, the CPJ argues that—like the Intelligence Agencies—the State Department is part of the Intelligence Community and thus is "positioned to speak on behalf of the entire Intelligence Community on issues related to foreign intelligence." Pl.'s Reply at 13 (citing 50 U.S.C. § 3003(4)(I)). But this is just a reformulation of the claim that one executive agency can speak for another one. Consider *Mobley v. CIA*, where the D.C. Circuit re-affirmed that "disclosure by one federal agency does not waive another agency's right to assert a FOIA exemption." 806 F.3d 568, 583 (D.C. Cir. 2015) (citing *Frugone*, 169 F.3d at 774–75). *Mobley* might be a stronger case for official acknowledgment than *Frugone*, because the CIA had itself acknowledged (mistakenly, it said) the records to the plaintiff before rescinding the acknowledgment as inaccurate. *See id*. at 584. Even so, the D.C. Circuit did not hold that "clerical mistake" against the CIA. *See id*. Or consider *Afshar v. Department of State*, where books by former CIA officials were not "official executive acknowledgments," despite passing the CIA's prepublication review. 702 F.2d 1125, 1133–34 (D.C. Cir. 1983). Even in these less-

attenuated cases, where disclosures passed unofficially through the same agency, the D.C. Circuit upheld the *Glomar* responses. So too here.

Perhaps more tellingly, the CPJ has not identified a single case countering the D.C. Circuit's unequivocal statements that each agency speaks for itself on FOIA disclosure. *See Frugone*, 169 F.3d at 774–75; *Mobley*, 806 F.3d at 583. And times when there *was* official acknowledgment show why the CPJ cannot bridge this gulf. Take *ACLU*, where the CIA refused to confirm or deny whether the Agency had any records related to the use of drones for lethal strikes. 710 F.3d at 425. By 2013, this was an untenable position for the CIA to take. Why? The President, the President's counterterrorism advisor, and even the Director of the CIA had all publicly acknowledged the use of drone strikes against al Qaeda. *See id*. at 429–30. *Those* were official acknowledgments, made by principal officers in the CIA's chain of command. And given them, crediting the CIA's *Glomar* responses would have given the Court's "imprimatur to a fiction of deniability that no reasonable person would regard as plausible." *Id*. at 431.

This is no such fiction. Like *Frugone*, 169 F.3d at 775, there is a substantial difference between the State Department's general press statement, *see* Press Briefing, Dep't of State, *supra*, note 2, and confirmation (or denial) that the Intelligence Agencies had (or did not have) "credible and specific information indicating an impending threat" to Khashoggi that would trigger the duty to warn, *see* Directive 191 ¶ E.1. Indeed, the State spokesperson qualified his statement to protect these same intelligence interests. *See* Press Briefing, Dep't of State ("although I *cannot comment on intelligence matters*, I can say definitively the United States had no advanced knowledge of Jamal Khashoggi's disappearance") (emphasis added). In contrast, the CIA's position in *ACLU* was "neither logical nor plausible" because the many

public statements about drone strikes overlapped entirely with the requested acknowledgment that the CIA "at least had an intelligence interest in such strikes." 710 F.3d at 430.

As a corollary argument, the CPJ argues that news reports confirm the Intelligence Agencies' intercept "of Saudi officials discussing a plan to capture Mr. Khashoggi." *See* Pl.'s Cross-Mot. at 25. But however credible the Committee to Protect Journalists may find news stories sprinkled with juicy tidbits from unnamed sources, the Court is unconvinced. After all, if people believed everything written in newspapers, there would be no need for official confirmation through this FOIA suit.

Although not a *Glomar* case, *Students Against Genocide* is instructive. There, then-Ambassador Madeleine Albright shared classified imagery during a closed-door presentation to the U.N. Security Council, and the government withheld some of that imagery from the FOIA requester. *See* 257 F.3d at 830. Under a related "waiver" doctrine, neither the sharing of that information with the U.N. nor news reports on the issue waived the government's ability to prevent any more disclosure. *See id*. at 836; *id*. at 834 n.9 (plaintiffs did not challenge *Glomar* responses on appeal); *see also ACLU v. DOD*, 406 F. Supp. 2d 330, 332 (S.D.N.Y. 2005) ("evidence revealed in the news media is not sufficient to overcome a *Glomar* response"). All considered, the CPJ has not met its burden of "pointing to specific information in the public domain that appears to duplicate that being withheld." *See Wolf*, 473 F.3d at 378.

That brings us to the Intelligence Agencies' declarations, which persuasively show just how much is at stake to protect national security. ODNI points out that confirming the existence of records related to Khashoggi could alert targets that "specific elements" of the Intelligence Community are employing "certain intelligence sources or methods . . . to collect information on them." Decl. of Patricia Gaviria ("ODNI Decl.") 9–10, ECF No. 34-2. Equally risky,

confirming their non-existence "identifies an area in which ODNI and the IC may lack interest in particular individuals, entities, or subjects, or an inability to obtain information on [them], and potentially confirms the success of any evasive techniques." *Id.*

This dilemma echoes in the other declarations, too. The NSA notes the specific threat to its Signals Intelligence activities, sources, and methods if a confirmation or denial is required. Decl. of Linda Kiyosaki ("NSA Decl.") 9, ECF No. 34-3. The CIA adds that confirmation could threaten "relationships with domestic or foreign entities," while denial could show "a blind spot" that adversaries may try to exploit. Decl. of Antoinette Shiner ("CIA Decl.") 19, ECF No. 34-4. And the FBI says it and the other Intelligence Agencies' positions are necessary because once the use or non-use of a source or method "in a certain situation or against a certain target" is public, "its continued successful use is seriously jeopardized." Decl. of David Hardy ("FBI Decl.") 9, ECF No. 34-5.

So the Intelligence Agencies have shown "the untoward consequences that could ensue were [they] required either to confirm or deny statements made by another agency." *See Frugone*, 169 F.3d at 775. This assessment is due "substantial weight." *See ACLU*, 710 F.3d at 427. And even if the CPJ's claims are true that the Intelligence Community's covert operations in the region are already "widely known," *see* Pl.'s Cross-Mot. at 25, confirmation "would remove any lingering doubts" that foreign states might have, *see Frugone*, 169 F.3d at 774 (cleaned up). More, "the perpetuation of such doubts may be an important means of protecting national security." *See id*. at 774-75. It is not the Court's place to question the Intelligence Agencies' "assessment of harm to intelligence sources and methods." *Students Against Genocide*, 257 F.3d at 835 (citation omitted). Congress entrusted that responsibility to the Director of National Intelligence, "not to the courts." *Id*.; *see* 50 U.S.C. § 3024(i)(1). Finding

ample support for the Intelligence Agencies' *Glomar* responses under Exemptions 1 and 3, the Court will not undercut the deference those agencies are due here.

## IV.

The assassination of Jamal Khashoggi was repugnant to humanity. The CPJ understandably seeks answers to explain the killing and protect other journalists from similar reprisals. But the Intelligence Agencies avow that the surest way to preserve the means and methods of intelligence collection against tomorrow's threats is to preserve them today. This is what the law compels and reason dictates. Accordingly, the Court will grant Summary Judgment for the Intelligence Agencies and deny it for the CPJ.[11]  A separate order will issue.


Dated: January 6, 2020 						TREVOR N. McFADDEN, U.S.D.J.

---

[11] The Court has considered the CPJ's requests for a motion hearing but finds oral argument unnecessary here. *See* LCvR 78.1.